**BAUSCH & LOMB INCORPORATED,**
**Plaintiff,**

v.

**ALCON LABORATORIES,**
**INC., Defendant.**

**No. 94–CV–6534L.**

United States District Court,
W.D. New York.

Sept. 16, 1999.

---

Michael Wolford, Wolford & Leclair LLP, Denis A. Polyn, Jill K. Schultz, Bausch & Lomb, Incorporated, Rochester, NY, Robert L. Baechtold, Scott K. Reed, Dominick A. Conde, Gregory B. Sephton, Daniel R. Cahoy, Fitzpatrick, Cella, Harper & Scinto, New York City, for Bausch & Lomb Incorporated, Plaintiff.

William L. Dorr, Harris, Beach & Wilcox, Rochester, NY, W. Edward Bailey, Kevin J. Culligan, A. Peter Adler, Fish & Neave, New York City, for Alcon Laboratiories, Inc., Defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION

Plaintiff, Bausch & Lomb Incorporated ("B & L"), commenced this action under 35 U.S.C. § 281, alleging that defendant, Alcon Laboratories, Inc. ("Alcon"), has infringed on United States Patent No. 5,096,607 ("the '607 patent"). The '607 patent claims an invention in a process for

simultaneously cleaning and disinfecting contact lenses using a single solution, as opposed to using two separate steps, first to clean the lenses and then to disinfect them.

Several motions are pending before the court. Alcon has filed a motion for summary judgment of indefiniteness, which seeks an order declaring the '607 patent invalid for indefiniteness under 35 U.S.C. § 112. B & L has filed a motion for summary judgment on Alcon's first and second counterclaims, which are respectively based on theories of misappropriation of trade secrets and unfair competition under New York law, and a motion for summary judgment on Alcon's fourth counterclaim, which is based on a constructive-trust theory.

## BACKGROUND

The '607 patent is directed to a method for simultaneously cleaning and disinfecting lenses. Prior to the development of such methods and systems, lens wearers had to clean and disinfect their lenses using two separate steps: first an enzymatic cleaning in which the lenses were soaked in a solution to remove protein deposits, followed by disinfection using either heat or a chemical solution. Although a user could have attempted to combine these steps by dissolving an enzymatic cleaning tablet in disinfecting solution, this would not have been very satisfactory, in part because the cleaning enzymes would have tended to reduce the effectiveness of the disinfecting solution, allowing a high level of microbes to remain living on the lens surface.

The patent states that its method for simultaneously cleaning and disinfecting contact lenses "does not substantially inhibit the activity of the antimicrobial agent." Defendant's Motion for Summary Judg-

ment of Indefiniteness Ex. 1. In other words, the presence of the cleaning enzymes does not "substantially inhibit" the effectiveness of the disinfectant. The patent does not, however, define the phrase "substantially inhibit." Alcon maintains that absent some objective, quantifiable parameters by which to determine how effective the disinfectant powers of the solution are, the phrase "substantially inhibit" renders the '607 patent void for indefiniteness. Alcon alleges that B & L deliberately used vague language so that it could avoid prior art yet still bring its competitors' products within the scope of the patent.

B & L contends that the claims are sufficiently definite. According to B & L and its expert, Dr. Barbara Iglewski, those skilled in the art would have understood that a difference of greater than one log order[1] in performance when the cleaning enzyme is added to the disinfecting solution, as compared to the antimicrobial activity of the solution without the enzyme present, would constitute a substantial inhibition.

## DISCUSSION

**I. Alcon's Motion for Summary Judgment of Indefiniteness**

**A. General Standards**

Paragraph 2 of 35 U.S.C. § 112 states that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Where the claims do not "have a clear and definite meaning when construed in the light of the complete patent document," the patent may be rendered invalid. *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 874–75 (Fed.

---

1. "Log order" refers to the use of a logarithm to the base 10 to measure antimicrobial activity. Thus, a 90% reduction of the presence of a particular microbe would a be 1–log reduction, a 99% reduction would be a 2–log reduc-

tion, a 99.9% reduction would be a 3–log reduction, and so on. A reduction from 3 logs to 2, then (*i.e.* from 99.9% to 99%) would constitute a difference of one log order in performance.

Cir.1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994).

The purpose of the definiteness requirement is twofold. First, a claim that clearly points out and distinctly claims an invention, alerts the public to what the patentee has claimed, so that potential infringers will be on notice of what may constitute infringement. Second, such a claim "makes clear any distinction that is supposed to exist between the patent and the prior art—i.e., it explains why the invention is novel." *Aluminum Co. of America v. Reynolds Metals Co.,* No. 88 C 6019, 1989 WL 165064 *4 (N.D.Ill.Dec. 21, 1989). *See also United Carbon Co. v. Binney & Smith Co.,* 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232 (1942); *In re Vamco Mach. and Tool Inc.,* 752 F.2d 1564, 1577 n. 5 (Fed.Cir.1985).

■ "A decision as to whether a claim is invalid under [§ 112 ¶ 2] requires a determination whether those skilled in the art would understand what is claimed." *Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1217 (Fed.Cir.1991) (citing *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 624 (Fed.Cir.1985) (claims must "reasonably apprise those skilled in the art" as to their scope and be "as precise as the subject matter permits"), *cert. denied,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985)), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). The degree of precision with which the claims must be stated to meet the definiteness requirement "is a function of the nature of the subject matter." *Miles Labs.,* 997 F.2d at 875. Thus, "[t]he amount of detail required to be included in claims depends on the particular invention and prior art, and is not to be viewed in the abstract . . . ," but in conjunction with the specifications of the patent. *Shatterproof Glass,* 758 F.2d at 624. Accordingly, "[t]hat some claim language may not be precise . . . does not automatically render a claim invalid. When a word of degree is used the district court must determine whether the patent's specification provides

some standard for measuring that degree," such that a person of ordinary skill in the art would understand what is claimed. *Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed.Cir. 1984). In addition, "[m]athematical precision should not be imposed for its own sake; a patentee has the right to claim the invention in terms that would be understood by persons of skill in the field of the invention." *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1557 (Fed.Cir.), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2523, 135 L.Ed.2d 1048 (1996).

■ Under 35 U.S.C. § 282 (1988), a patent is presumed valid, and a party seeking to overcome that presumption has the burden of proving the invalidity of the patent by clear and convincing evidence. *See Al–Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1323 (Fed.Cir.1999); *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 881 (Fed.Cir.1998). In determining a motion for summary judgment of indefiniteness, therefore, the court must remain cognizant both of the presumption of validity, and of the heightened standard required of the movant. *Id.; National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1189 (Fed.Cir. 1996).

## B. Alcon's Evidence

On the record before me, I find that Alcon has failed to carry its burden of establishing that there are no issues of material fact, and that it is entitled to judgment as a matter of law. Alcon's motion for summary judgment of indefiniteness is therefore denied.

In support of its motion, Alcon has not presented any expert testimony of its own. Instead, Alcon relies almost entirely on alleged contradictions and inconsistencies in the testimony and other statements of B & L's expert, Dr. Iglewski. Dr. Iglewski testified concerning the meaning of the claims in certain proceedings that took

place in the United States Patent and Trademark Office ("PTO"). The first of these was a reexamination proceeding that was initiated in December 1995 by Allergan, Inc., another manufacturer of contact lens-related products. On May 24, 1996, the PTO issued an Office Action rejecting the claims of the '607 patent as unpatentable in view of prior art references. Although the patent examiner was precluded from deciding issues of definiteness in that proceeding, *see* 37 C.F.R. § 1.552(c), he did indicate that he had some difficulty in determining the meaning of "does not substantially inhibit." After stating that "this broad concept requires that the activity of the antimicrobial agent (i.e., disinfectant) in the combined composition not be 'substantially' inhibited as compared to the same composition in the absence of the enzyme cleaner," he added that "[w]hether a 10%, 50%, 90%, 99% or 99.9% reduction in antimicrobial activity would be considered 'substantial' in the claimed methods cannot be determined by this Examiner based on the present record." Defendant's Motion for Summary Judgment of Indefiniteness ("MSJI") Ex. 4–A at 4. However, the patent examiner further stated that based on standards set forth by the Food and Drug Administration ("FDA"),

> if the inclusion of the recited enzyme cleaning component caused a 2 or 3 log reduction in antimicrobial efficiency, . . . FDA approval could still be possible to obtain. Accordingly, for purposes of these proceedings, a log reduction of 2 or 3 or even more will not be considered to be 'significant' unless the claims are amended to define "significant" to mean when the activity reduction is more than some specific numerical value under recited test conditions . . . .

*Id.* at 5.

As stated, the patent examiner then went on to find that the claims of the '607 patent were unpatentable due to prior art.

B & L then filed a request for reconsideration. In support of that request, B & L submitted a declaration by Dr. Iglewski. Although agreeing with the patent examiner that "determining 'substantial inhibition' of the activity of the antimicrobial agent, 'requires that the activity of the antimicrobial agent [with enzyme present]' be 'compared to the same composition in the absence of the enzyme,' " MSJI Ex. 4–C at 3 (brackets in original), she opined that those skilled in the art would have understood that "an inhibition which increased the risk of ocular infection to the extent that it prevented a product from being used, approved or sold for simultaneous cleaning and disinfection was 'substantial' . . . ." MSJI Ex. 4–C at 4.

On December 23, 1996, the PTO issued another Office Action in response to B & L's request for reconsideration. The patent examiner (who was not the same examiner who issued the first office action) also rejected the claims of the '607 patent based on prior art. In construing "substantially inhibit," she rejected B & L's proposed definition linking the meaning of that phrase to FDA approval criteria. Instead, she stated that

> [a]t face value . . ., the phrase "substantially inhibit" would mean "inhibit to a considerable, ample or large extent", and instant claims 1 and 13, in reciting that "the osmotic value"[2] be adjusted to/maintained at "a level which does not substantially inhibit the activity of said/the antimicrobial agent", simply require an osmotic value at which the activity of the recited antimicrobial agent is not inhibited to a considerable, ample or large extent. . . . Accordingly, it may be reasonably concluded that when the same amount of antimicrobial agent (that is, an amount effective to "at least partially reduce the microorganism population" when used in the *absence* of enzyme-a "disinfecting amount" as defined in the specification) is *in* effective

---

**2.** "Osmotic value," which is also sometimes referred to as "osmolality," refers to the concentration of solutes per unit of solvent in a solution.

to "at least partially reduce the microorganism population" when used in the *presence* of enzyme (that is, no longer meets the "disinfecting amount" definition), the activity of the antimicrobial agent is "substantially inhibited". MSJI Ex. 4–D at 7. The examiner also noted that B & L appeared to agree with this interpretation, since B & L had cited a case that, in construing the claim limitation "substantially all," referred to the dictionary definition of "substantial": "considerable, ample, large." *See id.;* MSJI Ex. 4–B at 12 (citing *Alcon Labs., Inc. v. Allergan, Inc.,* 17 USPQ2d 1365, 1369 (N.D.Tex. 1990)). B & L had also referred to that part of Dr. Iglewski's Declaration in which she stated that "the skilled worker would have known that ... the ordinary meaning of 'substantial' is 'important', 'considerable' or 'significant' ". MSJI Ex. 4–C at 3.

In response to the second Office Action, B & L again requested reconsideration. In support of that request, it submitted another declaration of Dr. Iglewski. After reciting the above-quoted statements by the patent examiner equating "substantially inhibit" with "inhibit to a considerable, ample or large extent," Dr. Iglewski opined that "those of ordinary skill in the art would also have understood the phrase to have that meaning." MSJI Ex. 4–F at 2. She added that those of ordinary skill in the art would have understood the reduction in antimicrobial activity that resulted from the addition of the prior art ReNu Effervescent cleaning enzyme to prior art ReNu disinfecting solution (which, she stated, resulted in an average inhibition of antimicrobial activity against a certain microbe of more than 3 log orders) to have been "considerable, ample, large," and therefore "to have been a 'substantial inhibition' of antimicrobial activity." *Id.* at 3.

The PTO then issued a third Office Action. At B & L's request contained in its second request for reconsideration, the PTO canceled claim 12 of the '607 patent, but rejected claims 1–11 and 13–20. The examiner, however, revised her interpreta-

tion of "substantially inhibit." She agreed with B & L that the previous (second) Office Action appeared to contradict itself in certain respects. Although at one point the second Office Action had indicated that a determination of whether antimicrobial activity was substantially inhibited required a comparison ·of that activity with and without the presence of cleaning enzyme, it had elsewhere stated that "as long as the resultant composition [*i.e.* with enzyme present] is able to 'at least partially reduce the microorganism population', the activity of the corresponding antimicrobial agent will be considered 'not substantially inhibit[ed]' ...." MSJI Ex. 4–D at 8. Observing that this statement appeared not to require any comparison between the enzyme-free and enzyme-containing systems, the patent examiner stated that she had come to the conclusion that indeed no such comparison was necessary.

The examiner said that her prior construction of the claims as requiring a comparative analysis had not been confined to the actual words of the claims themselves, as it should have been, but had begun with the previous patent examiner's view that a comparative approach was necessary. The examiner stated that upon reconsideration, she did not believe that the claims themselves called for such an approach. Stating that "it is again concluded that the term 'substantially' should simply be given its ordinary and accustomed meaning," *i.e.,* "considerable, ample, large," the examiner concluded that "[t]he phrase 'not substantially inhibit' therefore means 'not inhibit to a considerable, ample or large extent' ...." MSJI Ex. 4–G at 8. Recognizing, however, that this ruling "represent[ed] a *significant shift* in the [Patent and Trademark] Office's interpretation" of the claims, *id.* at 4, the examiner made the Office Action non-final, and allowed B & L to submit additional evidence of patentability in anticipation of a further Office Action, which was intended to be a final action.

B & L did so, again requesting reconsideration and confirmation of the claims. B & L sought to persuade the examiner to re-adopt her prior position that the phrase "does not substantially inhibit" meant that the addition of cleaning enzyme did not "considerably, amply, [or] largely" inhibit antimicrobial activity as compared with the antimicrobial activity of the same solution without the enzyme present. MSJI Ex 4–H at 5.

In a fourth Office Action, the patent examiner again rejected the claims. She reaffirmed her belief that the words used in the claims did not call for any comparative analysis, and stated that "as long as a level of activity *consistent with the disinfection of contact lenses is retained* for the combination of antimicrobial agent with enzyme, the activity of the antimicrobial agent will be considered not substantially inhibited." MSJI Ex. 4–I at 9.

Following the issuance of this Office Action, representatives of B & L met with the patent examiner. During the interview, B & L argued that certain portions of Alcon's reexamination request, upon which the examiner had relied, were directed to § 112 issues and hence not appropriate for consideration in the context of a reexamination proceeding. B & L repeated that argument in its response to the fourth Office Action, in which it again requested reconsideration and confirmation of claims 1–11 and 13–20. *See* MSJI Ex. 4–K at 2. In support of that request, B & L also submitted another declaration of Dr. Iglewski, in which she reiterated her opinion that "does not substantially inhibit" means that the addition of a cleaning enzyme does not restrain or restrict antimicrobial activity to an "ample, large or considerable" extent as compared to the antimicrobial activity of an enzyme-free solution. Affidavit of Steven C. Kline (Docket Item 205) Ex. 21 at 8.

The examiner then issued a Notice of Intent to Issue Reexamination Certificate in which she indicated that claims 1–11 and 13–20 would be confirmed. Agreeing with

B & L that several of her prior reasons for rejecting the claims were directed to § 112 issues, and therefore outside the scope of the reexamination proceeding, she advised B & L "that it may be desirable to consider filing a reissue application provided that patentees believe one or more claims to be partially or wholly inoperative or invalid based upon these issues." MSJI Ex. 4–L at 3. The examiner also ruled that the PTO's original construction of "does not substantially inhibit" was correct. She concluded that the phrase meant that "the osmotic value of said aqueous system is adjusted to a level which does not [considerably, amply, largely] inhibit the activity of said antimicrobial agent [as compared to the same composition in the absence of the enzyme formulation] . . . ." *Id.* (brackets in original).

In addition to this evidence, Alcon also relies on B & L's prosecution of several related patent applications, which Alcon contends demonstrate that B & L is able to use more specific claim language than "does not substantially inhibit." The evidence relating to those applications will be discussed as necessary later in this Decision and Order.

## C. Alcon is not Entitled to Summary Judgment

After reviewing all the evidence, I find that Alcon has failed to carry its burden of demonstrating that it is entitled to summary judgment. Although Alcon's evidence, together with whatever other evidence it presents at trial, may ultimately demonstrate conclusively that Alcon has proved by clear and convincing evidence that the patent is invalid for indefiniteness, at this point I am not convinced that no issues of material fact in that regard exist, or that that is the only reasonable conclusion to which a rational factfinder could come.

As stated, Alcon relies heavily on alleged inconsistencies within B & L's own definitions of "substantially inhibit," particularly

those within the various declarations and statements of Dr. Iglewski. Alcon has not submitted any affirmative evidence, such as a declaration by an expert of its own, tending to show that persons skilled in the art would not understand the meaning of that phrase.

Although a movant's failure to present expert testimony may not necessarily preclude summary judgment in the movant's favor, it certainly renders summary judgment less appropriate. *See, e.g., Australia Vision Services Pty. Ltd. v. Dioptics Med. Products, Inc.*, 29 F.Supp.2d 1152, 1159 (C.D.Cal.1998) (noting that defendant "did not include any evidence or declarations by experts in the field to attest to the indefiniteness of the '083 patent design," and stating that "[t]he Court cannot conclude the '083 patent is invalid as a matter of law because the court lacks the expertise" to determine the issue of indefiniteness on its own); *Tuff Torq Corp. v. Hydro–Gear Ltd. Partnership*, Civ. D. 93–414–SLR, 1994 WL 827767 *13 (D.Del. Oct. 27, 1994) ("Since neither party has offered expert testimony on either the adequacy of the description of the claim nor the amount of detail required by the prior art to describe this invention, the Court denies entry of summary judgment on this issue"); *Water Technologies Corp. v. Calco, Ltd.*, 658 F.Supp. 961, 972 (N.D.Ill.1986) (rejecting defendants' argument that patents did not comply with § 112, in part because "[d]efendants' expert ... gave no testimony that the patents were indefinite"), *aff'd in part, rev'd on other grounds in part*, 850 F.2d 660 (Fed.Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); *see also Leading Edge Tech. Corp. v. Sun Automation, Inc.*, Civ. No. H–90–2316, 1991 WL 398682 *12 (D.Md. Sept. 24, 1991) (stating that the conflicting expert testimony concerning indefiniteness by both sides' experts "makes it inappropriate for the Court to decide these questions by way of a motion for summary judgment").

At the heart of Alcon's contention that the term "does not substantially inhibit" is fatally indefinite is its assertion that B & L could have and should have set some precise, quantifiable parameters for the antimicrobial activity of the patented product. In other words, Alcon claims that B & L could have provided specific numerical values showing to what extent the product will reduce the populations of various microbes over a given length of time. Absent such numbers, Alcon contends, one skilled in the art would be unable to determine whether antimicrobial activity has been "substantially inhibited."

The law is clear that the use of terms of degree, such as "substantially," in patent claims does not necessarily render the claims indefinite. In fact, the Court of Appeals for the Federal Circuit has recognized that such "words are ubiquitous in patent claims." *Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821 (Fed. Cir.) (referring to, *inter alia*, phrase "substantially equal"), *cert. denied*, 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988); *see also Atmel Corp. v. Information Storage Devices, Inc.*, 997 F.Supp. 1210, 1228 (N.D.Cal.1998) (holding term "substantially all" not to be indefinite); *Pave Tech, Inc. v. Snap Edge Corp.*, 952 F.Supp. 1284, 1292 (N.D.Ill.1997) (term "substantial," when considered in light of entire claimed invention, was as accurate as subject matter permitted, and provided sufficient guidance to one skilled in the art); *James River Corp. of Virginia v. Hallmark Cards*, 915 F.Supp. 968, 989 (E.D.Wis. 1996) (word "substantially" in term "substantially integrated" was sufficiently defined, since one skilled in the art could recognize the difference between prior art and the claimed invention); *BOC Health Care, Inc. v. Nellcor Corp.*, 892 F.Supp. 598, 613 (D.Del.1995) (finding phrase "substantially planar" to be sufficiently defined to those skilled in the art to avoid invalidity), *aff'd*, 98 F.3d 1357 (Fed.Cir.1996); *Tuff Torq Corp.*, 1994 WL 827767 *12–13 (denying motion for summary judgment of indefiniteness with respect to term "substantially level"). Therefore, "[t]hat some

claim language may not be precise … does not automatically render a claim invalid." *Seattle Box Co.*, 731 F.2d at 826. Certainly there may be times when the use of a word like "substantially" *does* render a claim indefinite, but there is no *per se* rule either way; each case must be determined on its own facts.

The court in *Seattle Box Co.* went on to state that "[w]hen a word of degree is used the district court must determine whether the patent's specification provides some standard for measuring that degree. The trial court must decide, that is, whether one of ordinary skill in the art would understand what is claimed when the claim is read in light of the specification." *Id.* The court's reference to "measuring," however, should not be read as necessarily requiring specific numbers. Indeed, the Federal Circuit has cautioned that "[m]athematical precision should not be imposed for its own sake …." *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed.Cir.) (affirming finding that use of term "relatively small" did not render claim invalid for indefiniteness), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2523, 135 L.Ed.2d 1048 (1996). The ultimate question is not whether the claim contains precise numerical limits such that *anyone* could tell whether a product falls within the scope of the claims, but whether a person *of ordinary skill in the art* would understand what is claimed. *Seattle Box Co.*, 731 F.2d at 826.

Although there might be times when a person of ordinary skill in the art would need objectively quantifiable, precise measures in order to understand the claims, no across-the-board rule can be laid down in that regard, for "[t]he degree of precision necessary for adequate claims is a function of the nature of the subject matter." *Miles Labs.*, 997 F.2d at 875. *See also Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 823 (Fed.Cir.) ("The law imposes no obligation on a patent applicant to … set the claim limits at the precise

technological edge of the invention. A claim is not fatally indefinite for failing specifically to delineate the point at which the change in physical phenomenon occurs"), *cert. denied*, 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988).

Likewise, while Alcon cites the oft-repeated statement that "if the language is as precise as the subject matter permits, the courts can demand no more," *Shatterproof Glass*, 758 F.2d at 624, that too must not be read as demanding mathematical precision in all cases. The Federal Circuit has similarly stated that "[i]f the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *Miles Labs.*, 997 F.2d at 875. Thus, simply because claims *could* be framed in terms of specific numbers does not mean that they *must* be. The bottom line is whether one of ordinary skill in the art would understand the claims, and as stated, Alcon has presented no evidence affirmatively showing that the '607 patent fails to meet that standard.

As for the alleged inconsistencies in B & L's interpretation of the claims, to a great extent these are simply the result of Dr. Iglewski's statements being taken out of context. When the entire course of events in the PTO proceedings are viewed as a whole, most if not all of those alleged inconsistencies and self-contradictions disappear.

Alcon contends that B & L has asserted some ten different definitions of "substantially inhibited" at one time or another, but an examination of the ten alleged definitions shows otherwise. The first alleged definition is (in Alcon's words) that a "combined solution with an osmotic value greater than 800 mOsm./kg[3] of water is 'substantially inhibited.' " Alcon's Demonstrative Exhibits ("Demo.Ex.") Ex. 11. The language in the '607 patent upon which Alcon bases that assertion, however, nowhere uses the words "substantially in-

---

3. Osmolality is measured in units of milliOs-    moles per kilogram (mOsm./kg) of water.

hibit." It merely states that antimicrobial agents have been found to be "rendered less effective in environments having high osmotic values, generally above 800 mOsm. /kg. water ....," and that "a preferred range of osmotic values has been found to be less than about 800 mOsm./kg. water ...." MSJI Ex. 1 col. 5, lines 55–60 and col. 6, lines 7–11. The patent does not equate any of those osmolality levels with antimicrobial levels that are or are not "substantially inhibited," nor does the evidence compel an inference to that effect. That is not to say that these statements have no relevance to the phrase "does not substantially inhibit." As stated, claims are to be interpreted in light of the entire claimed invention and in conjunction with the specifications of the patent. But to read these statements as defining "does not substantially inhibit" is, at the very least, not something that the court can do on a motion for summary judgment.

The second alleged definition is: "A combined solution that reduces the microbial population by 2 log orders in four hours or 1 log order in one hour is not 'substantially inhibited.'" Demo. Ex. 2. The third is: "A combined solution with activity of at least 3 log orders against S. epidermidis and no growth of C. albicans [two types of microbe] in 5 hours is not 'substantially inhibited.'" Demo. Ex. 12.

As with the first alleged definition, both of these are based on text that has been extracted from the '607 patent, which states at one point:

A disinfecting amount of antimicrobial agent is an amount which will at least partially reduce the microorganism population in the formulations employed. Preferably, a disinfecting amount is that which will reduce the microbial burden by two log orders in four hours and more preferably by one log order in one hour.

MSJI Ex. 1, col.5, lines 41–46. Elsewhere, the '607 patent incorporates by reference the following statement from its prior Patent No. 4,758,595:

In this example the effectiveness of polyhexamethylene biguanide hydrochloride (n=4.5 to 6.5) as a disinfecting agent is evaluated.... To be considered effective in this test, there must be at least 3 log (10³) reduction in the amount of S. epidermidis and no growth in C. albicans within 5 hours.

MSJI Ex. 1, col. 5, lines 37–39; Ex. 3, col. 12, lines 25–37.

Again, these are simply statements that have been taken out of context and which make no reference at all to the term "substantially inhibit." Virtually every patent is probably susceptible to such manipulation; one could always take descriptive language from one part of the patent and claim that it defines some term in the claim language, but Alcon has not shown why a factfinder would *have* to accept that argument here.

The fourth alleged definition is the first which actually purports to define the claim. In her August 8, 1996 declaration in response to the first Office Action that rejected the claims of the '607 patent, Dr. Iglewski stated that "[t]hose skilled in the art clearly recognized that an inhibition which increased the risk of ocular infection to the extent that it prevented a product from being used, approved or sold for simultaneous cleaning and disinfection was 'substantial' as was the case with the prior art ...." MSJI Ex. 4–C at 4.

Alcon contends that in her subsequent declaration in response to the second Office Action, Dr. Iglewski then offered two other, different interpretations. In that declaration, dated March 18, 1997, she stated at one point that

[t]hose of ordinary skill in the art would have certainly considered such an inhibition [of more than 3 log orders against S. marcescens] to have been "considerable, ample, large." In other words, those of ordinary skill in the art would have considered the reduction in antimicrobial activity which resulted from [prior art] ReNu Effervescent enzyme being

added to ReNu solution to have been a "substantial inhibition" of antimicrobial activity.

MSJI Ex. 4–F at 3. She also stated in that same declaration that

[t]hose of ordinary skill in the art would have certainly considered such an inhibition [of 4 log orders against S. aureus hours and almost 3 log orders against P. aeruginosa] to have been "considerable, ample, large." In other words, those of ordinary skill in the art would have considered the reduction in antimicrobial activity which resulted from [prior art] Opti–Zyme enzyme being added to Opti–Soft solution to have been a "substantial inhibition" of antimicrobial activity.

Id. at 4. Alcon views all of these statements as setting forth different, inconsistent definitions of "substantially inhibit."

The difficulty with Alcon's argument, however, is that it presumes that there can be one and only one way to determine whether antimicrobial activity is substantially inhibited. By way of analogy, one could say that water will feel cold to the touch if ice is beginning to form on its surface, that water will feel cold if it is cold enough to turn one's skin blue and numb, that water feels cold at 33˜F, and so on. Those statements, however, need not be viewed as mutually exclusive, nor does it mean that the average person would not understand what another person means when he says that certain water feels cold.

While this everyday example is not meant to suggest the degree of definiteness required of a patent claim, the point is that just because Dr. Iglewski at various times has stated that solutions with different types of characteristics would be understood by those skilled in the art to have substantially inhibited antimicrobial activity does not mean that the term "substantially inhibit" is indefinite for purposes of § 112. In particular, the latter two of these three alleged definitions advanced by

Dr. Iglewski were simply meant to distinguish two different combinations of prior art products (ReNu cleaner and solution, and Opti–Zyme cleaner and Opti–Soft solution) by stating that the decrease in antimicrobial activity exhibited by those products when they were combined would have been understood by those skilled in the art to have exhibited substantially inhibited antimicrobial activity.

Moreover, since the patent examiner had already rejected B & L's assertion that whether antimicrobial activity was substantially inhibited could be determined by reference to whether the product met the requirements for FDA approval, B & L had little choice but to offer an alternative to that definition. That does not necessarily show that the term "substantially inhibit" cannot be understood by one of ordinary skill in the art, only that, at least in the view of the patent examiner, B & L's first definition of that term was incorrect.

A number of other alleged definitions of "substantially inhibit" that Alcon claims have been offered by B & L are taken from B & L's prosecution of patent applications related to the '607 patent. These include: Patent Application Serial No. 08/072,809 ("the '809 application"), which was filed in June 1993; Patent Application 08/269,721 ("the '721 application"), which B & L filed in July 1994; and a European patent application ("the European application"), which resulted in the issuance of European Patent No. 384 666.[4] The '809 application is a continuation of Patent Application Serial No. 07/852,617, which in turn is a divisional application of Patent Application Serial No. 07/515,290, from which the '607 patent issued. The '721 application is a divisional application of the '809 application. Alcon describes the European application as a "counterpart" application to the '607 patent.

The gist of Alcon's arguments concerning these applications is that in each of

4. On February 11, 1998, the Opposition Division of the European Patent Office revoked B & L's patent, for a number of reasons. See MSJI Ex. 9–C.

those applications, B & L used claim limitations requiring specific osmotic values or levels of disinfection. This, according to Alcon, demonstrates that B & L could have used more precise claim language in the '607 patent.

■ As with many of Alcon's other arguments, this might prove persuasive to the finder of fact, but my task here is to determine whether there are any issues of fact, and I believe that such issues do remain. For one thing, although these other patent applications have some relevance to the issue of indefiniteness, it must be kept in mind that whether a patent satisfies the requirements of § 112 must be determined with reference to the date the application was filed. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556–57 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). A valid patent cannot be rendered indefinite by events that occur after its issuance. *Id.; Lubrizol Corp. v. Exxon Corp.*, 696 F.Supp. 302, 322 (N.D.Ohio 1988). Thus, the fact that B & L sought to narrow some of its claims subsequent to the issuance of the '607 patent does not compel the conclusion that the '607 patent is fatally indefinite.

Moreover, it bears repeating that, despite language in the case law about claims being "as precise as the subject matter permits," the ultimate question is whether the language is precise enough to allow one skilled in the art to understand what is claimed. *Amgen*, 927 F.2d at 1217. If so, "[m]athematical precision should not be imposed for its own sake ...." *Modine Mfg.*, 75 F.3d at 1557. In view of the opinion testimony of Dr. Iglewski that a person skilled in the art would understand what the phrase "does not substantially inhibit" means, and Alcon's failure to present contrary expert testimony, I find that this evidence relating to other patent applications does not demonstrate that the '607 patent is indefinite as a matter of law.

Alcon also refers to some other alleged definitions that B & L has propounded at times, but again I do not view them as necessarily inconsistent with the definition advanced by B & L in this lawsuit, *i.e.*, that a difference of greater than one log order in performance with and without the enzyme formulation is a substantial inhibition. For example, in its response to the fourth Office Action, B & L contended that the phrase "does not substantially inhibit" means that "the osmotic value of said aqueous system is adjusted to a level which does not [considerably, amply, largely] inhibit the activity of said antimicrobial agent [as compared to the same composition in the absence of the enzyme formulation.]" MSJI Ex. 4–K at 10.

That is consistent with the position advanced by B & L in this litigation. Dr. Iglewski has simply said that one skilled in the art would understand that a difference of greater than one log order in performance represents a "considerable, ample, or large" degree of inhibition, and hence a "substantial" inhibition.

Alcon also argues that a one log order of difference is statistically insignificant because there is a ± 0.5 error of margin when measuring log reductions, so that two log reduction values within 1.0 log of each other are considered the same as a statistical matter. Even if that is true, however, I read Dr. Iglewski's statement that a person of ordinary skill in the art would recognize that a difference of *greater* than one log order represents a substantial inhibition as indicating that, indeed, the difference has to be large enough to be statistically significant in order to be "substantial."

As for Alcon's assertion that nothing in the '607 patent requires that assessing whether inhibition is substantial requires a comparison of antimicrobial activity with and without enzyme present (as opposed to simply measuring the antimicrobial properties of the combined solution), I find that to be a matter more pertinent to claim construction than to definiteness. I ex-

press no opinion at this time as to whether such an assessment is required, but I do not believe that the patent's lack of express language mandating a comparative analysis renders it indefinite.

For all these reasons, then, Alcon's motion for summary judgment of indefiniteness is denied at this time. Since indefiniteness is a question of law, however, *see Credle v. Bond,* 25 F.3d 1566, 1576 (Fed. Cir.1994); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1576 (Fed.Cir.1986); *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 891 F.Supp. 751, 810 (E.D.N.Y.1995), *aff'd,* 96 F.3d 1409 (Fed. Cir.1996), it remains the task of this court to decide this issue. In light of the underlying factual issues that preclude the entry of summary judgment, I am therefore setting this case down for an evidentiary hearing prior to trial, at which the court will take testimony regarding whether persons of ordinary skill in the art would understand the claims, and if so, what they would understand them to mean.

## II. Bausch & Lomb's Motion for Summary Judgment Dismissing Alcon's Counterclaims

B & L has moved for summary judgment dismissing Alcon's first, second and fourth counterclaims, which are respectively based on theories of misappropriation of trade secrets, unfair competition, and constructive trust. Each of these counterclaims is asserted under New York law pursuant to this court's supplemental jurisdiction under 28 U.S.C. § 1367.

The factual basis for all three of these counterclaims is essentially the same. Alcon alleges that Dr. George Minno, who was employed at Alcon from 1985 until he left to take a position with B & L in 1986, was exposed to confidential information during his employment with Alcon, which he subsequently disclosed to B & L, in violation of the terms of his employment agreement. This information allegedly related to a number of matters, including:

Alcon's proprietary antimicrobial agent, Polyquad; the use of Polyquad in systems for cleaning and disinfecting contact lenses (such as Alcon's OPTI–SOFT and OPTI–ZYME system); the effect of ionic strength[5] on the antimicrobial activity of Polyquad; liquid enzyme products; and the use of the "Ninhydrin Protein Assay," which is a method of quantifying the amount of protein present on a contact lens. Alcon alleges that B & L made use of this information in obtaining the '607 patent.

### A. Alcon's First and Second Counterclaims

B & L contends that all three of these counterclaims should be dismissed for several reasons, but the first that I will address is B & L's assertion that the first and second counterclaims are time-barred. The parties agree that New York's three-year statute of limitations for actions to recover damages for injury to property applies to these claims. N.Y. C.P.L.R. § 214(4).

There is some dispute about when these claims arose, however. B & L contends that they arose no later than August 29, 1990, when B & L's European application was published. According to B & L, Alcon's own allegations indicate that the European application disclosed the alleged misappropriated trade secrets. If that factual assertion is correct, then the limitations period would have expired on August 29, 1993. Alcon did not assert its counterclaims until December 21, 1994.

In response, Alcon contends that the trade secrets may be "embodied" in the European application, but are not disclosed there. In other words, Alcon claims, B & L used this information in developing the products that were the subject of the '607 and European patents, but the European application did not expressly set forth those secrets.

---

**5.** The ionic strength of a solution is a measure  of the concentration of ions in the solution.

Alcon also maintains that its Ninhydrin Protein Assay was not published until November 1991, when Dr. Minno and several coauthors published details of the assay in a scientific journal, *Optometry and Vision Science*. Alcon contends that the first two counterclaims are therefore not time-barred, because they were not barred at the time that B & L filed its complaint. *See* C.P.L.R. § 203(d).

In addition, Alcon urges this court to adopt a "discovery rule," under which the limitations period would not begin to run until Alcon's discovery of its causes of action. Alcon maintains that it did not discover that B & L had misappropriated confidential Alcon information until October 17, 1994, when counsel for B & L disclosed to Alcon's in-house counsel Dr. Minno's role in the development of the invention of the '607 patent. If such a rule were applied here, under New York's "discovery" provision, C.P.L.R. § 203(g), Alcon would have had two years after that date to interpose these counterclaims.

Alcon concedes, however, that it has no case law from New York applying a discovery rule to trade secret or unfair competition claims, and in fact at least one district court within this state has rejected application of such a rule to an action for misappropriation of trade secrets. *See M & T Chemicals, Inc. v. International Business Machines Corp.*, 403 F.Supp. 1145, 1148 n. 4 (S.D.N.Y.1975), *aff'd*, 542 F.2d 1165 (2d Cir.), *cert. denied*, 429 U.S. 1030, 97 S.Ct. 656, 50 L.Ed.2d 637 (1976).[6]

Alcon further asserts that B & L's continued use of Alcon's trade secrets constitutes a continuing tort, thereby giving rise to continued causes of action through the present day. Lastly, Alcon argues that even if the court decides that Alcon did not assert its trade secret and unfair competi-

tion claims timely, under New York's "recoupment doctrine," *see* C.P.L.R. § 203(d), the counterclaims are not barred "to the extent of the demand in the complaint . . . ." *Id.*

■ In the absence of any authority from New York state courts supporting the application of a discovery rule to these counterclaims, I decline to apply such a rule here. Nonetheless, I believe that there are issues of fact concerning when these causes of action arose, and I therefore decline to grant B & L's motion for summary judgment on limitations grounds.

It is clear that under the law of both New York and the Second Circuit, factual issues relating to statute of limitations matters can preclude summary judgment on that ground. *See, e.g., Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 942–43 (2d Cir.1998); *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir.1994) ("in some circumstances, factual issues related to statute of limitations should be put before a jury"), *cert. denied*, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995); *M/S Shiraz Impex v. Beech–Nut Nutrition Corp.*, 715 F.Supp. 1230, 1233–34 (S.D.N.Y.1989); *Richardson v. Orentreich*, 64 N.Y.2d 896, 899, 487 N.Y.S.2d 731, 477 N.E.2d 210 (1985); *Yatter v. William Morris Agency, Inc.*, 256 A.D.2d 260, 682 N.Y.S.2d 198, 199 (1st Dep't 1998); *Juman v. Louise Wise Services*, 254 A.D.2d 72, 73, 678 N.Y.S.2d 611 (1st Dep't 1998).

Although B & L insists that the alleged trade secrets and proprietary information were disclosed in the European application, I do not believe that the facts are so clear-cut in that regard that I can grant summary judgment to B & L. It is true that Alcon describes its alleged trade secrets as having been "embodied" in the

---

**6.** Contrary to Alcon's assertion, I do not agree that the court in *M & T* found it unnecessary to reach the issue of whether the discovery rule applied in that case because it found that plaintiff had imputed knowledge of its cause of action prior to the commencement of the discovery period. As I read the decision in *M & T*, the court's findings concerning the plaintiff's knowledge were presented only as an *alternative* ground for its holding that the action was time-barred.

European application, but that does not necessarily amount to an admission that they were disclosed in that application. Although B & L contends that Alcon is simply playing semantic games here, it is possible that a patent application could be based on misappropriated trade secrets without expressly disclosing them so as to give rise to a cause of action. Upon my review of the record, I believe that this is a matter best left to a jury to decide.

With respect to one alleged trade secret, the use of the Ninhydrin Protein Assay to measure the amount of protein present on a contact lens, Alcon contends that B & L did not disclose this secret until the 1991 publication of an article co-authored by Dr. Minno. However, B & L has submitted a copy of a promotional brochure that B & L alleges it distributed in 1988 describing tests that it performed using its own enzymatic cleaner and several competitors' cleaners. The brochure states that the objective of the test was "[t]o establish the range of protein deposits that are found on human-worn polymacon lenses." Kline Aff. 196 Ex. 31. It also states that "[l]enses were ... assayed using a quantitative testing procedure for measuring protein, the Ninhydrin Protein Assay." *Id.* A footnote stated, "Data for this quantitative procedure is on file at Bausch & Lomb." *Id.*

In his deposition during litigation between Alcon and Allergan, Inc., Dr. Quintana was shown this brochure. He testified that the Ninhydrin Protein Assay referred to in the brochure was the same one "developed by Dr. Minno while he was working at Alcon ...." When asked whether, to his knowledge, this was "the first public reference to the use of the Ninhydrin Protein Assay in connection with contact lenses," he replied, "To the best of my knowledge, yes." Affidavit of Steven C. Kline (Docket Item 223) at 119–20.

■ Under New York law, when a trade secret misappropriation claim accrues depends on what the party alleged to have committed the misappropriation did with the information. If a party misappropriates and publicly *discloses* a trade secret, the claim accrues upon disclosure. If, however, the party "keeps the secret confidential yet makes use of it to his own commercial advantage, each successive use constitutes a new actionable tort for purposes of the statute of limitations. This rule reflects the principle that 'once the information is no longer secret or confidential, there is no property to protect.' " *Architectronics, Inc. v. Control Systems, Inc.,* 935 F.Supp. 425, 433 (E.D.N.Y.1996) (quoting *Construction Technology, Inc. v. Lockformer Co.,* 704 F.Supp. 1212, 1225 (S.D.N.Y.1989)).

At page 21 of its brief, Alcon contends that the 1988 B & L literature "did not disclose Alcon's trade secrets because it did not disclose the use of the Ninhydrin protein assay to measure protein adsorption onto contact lenses." That statement is directly contradicted by the language of the brochure itself, however, which clearly explains that that is exactly what was done.

In ¶ 22 of its Counterstatement of Material Facts as to Which there Exist Genuine Issues to Be Tried, Alcon also states that this literature "does not contain any descriptive or detailed information about the ninhydrin protein assay referenced therein," and that it is therefore "not possible to determine whether that literature references the assay first developed at Alcon." Alcon adds that "no facts have been adduced to establish that the Bausch & Lomb promotional literature was ever published or made publicly available."

Although the issue is a close one, viewing the record in the light most favorable to Alcon, I believe that this aspect of Alcon's counterclaims should also go to trial. Certainly one could view B & L's statement in the brochure that it had measured the amount of protein on contact lenses by using the Ninhydrin Protein Assay as a "disclosure" of the alleged trade

secret for limitations purposes. First, though B & L describes the literature in question as a 1988 promotional brochure, it is not apparent at this point what B & L actually did with this brochure in terms of publication or distribution. In addition, while I am not convinced that the brochure's lack of detail describing the assay means that it was *not* a disclosure, on balance I think it better that this issue be decided by a jury, particularly since the other bases for these two counterclaims are going to trial. If the brochure did disclose B & L's use of this alleged trade secret in 1988 as clearly as B & L suggests, it should require little additional proof to convince a jury of that fact.

As for the other grounds for Alcon's motion to dismiss the first two counterclaims, I find that there are issues of fact relating to these grounds as well. In a nutshell, B & L contends that Alcon has not produced any evidence showing that Minno was exposed to any of the alleged proprietary information while he was at Alcon, or that he disclosed any of that information to B & L. B & L contends that Alcon's allegations in this regard are based upon sheer surmise and speculation.

After reviewing the evidence presented by both sides, I find that Alcon has demonstrated that genuine issues of material fact exist relating to these counterclaims. The fundamental questions here are what information Dr. Minno possessed and whether he revealed it to B & L. While at this point there appears to be no "smoking gun" showing conclusively that Dr. Minno did transmit confidential information to B & L, I believe that there is enough evidence to at least raise a genuine issue of fact about whether he did.

For example, Alcon has presented evidence that at a June 24, 1986 "quad review" meeting of Alcon's Optical Products staff, Alcon scientist Ruth Ann Rosenthal gave a presentation concerning her OPTI–SOFT/OPTI–ZYME research. Affidavit of Steven C. Kline Aff. (Docket Item 196) ("Kline Aff. 196") Ex. 9. While there does not appear to be any direct evidence that Dr. Minno was present at that meeting, Dr. Ronald Quintana, who at all relevant times was Assistant Director, Optical Products in the Optical Department of Alcon's Research & Development Division, has testified in a deposition that all members of the lens care group (which included Dr. Minno) would typically be present at the quad review meetings. Affidavit of Russell W. Faegenburg (Docket Item 217), Ex. 8 at 92.

There is also direct evidence that Dr. Minno did attend several similar meetings of Alcon's lens care research scientists, and that he made presentations at those meetings. *See* Faegenburg Aff. Ex. 3 at I 821180; Ex. 5 at I 822277; Ex. 6 at A 406463; Ex. 9 at I 821152; Ex. 10 at I 821140; and Ex. 11 at I 822211. While certainly not conclusive, this is some circumstantial evidence tending to show that Dr. Minno may have been at the June 24, 1986 quad review meeting where Rosenthal gave her presentation, which at the very least suggests that issues of fact do exist about the extent of Dr. Minno's knowledge of Alcon's research and development in this area.

Dr. Quintana also testified that Dr. Minno was present at a January 29, 1986 meeting of the Optical Products staff. His minutes from that meeting indicate that Rosenthal spoke at that meeting about her work with Polyquad. While this, too, does not conclusively demonstrate that Dr. Minno was exposed to any trade secrets in this regard, it does reinforce the notion that these matters cannot be resolved on a motion for summary judgment.

There is also documentary evidence, in the form of notes and memoranda drafted by Dr. Minno and others at Alcon, indicating that Dr. Minno had participated in discussions about possible new Alcon cleaning and disinfecting products. One of them, a notebook entry by Dr. Minno, refers to a liquid enzyme that "could . . . have a chemical disinfectant added to clean

& disinfect in one step." Affidavit of Daniel R. Cahoy (Docket Item 200) Ex. 8. Dr. Minno also wrote about an "Enzyme (Muti [sic] Enzyme) Product for cleaning and disinfecting" that, he wrote, "could also be formulated in liquid form." *Id.*

In a memorandum dated May 2, 1986, entitled "Proposals for New Enzyme Products for Alcon's Lens Care Product Line," Cahoy Aff. Ex. 7, Dr. Minno also discussed in some detail a proposed "Multi–Enzyme Product for the Cleaning and Disinfection of Contact Lenses." After explaining the underlying chemical processes and considerations required to develop such a system, he concluded that "the cleaning and disinfection of contact lenses could be carried out in a single step by one product." *Id.* at 2.

B & L insists that none of these documents contain any actual trade secrets, that the basic concepts contained in them were known throughout the industry, and that they are lacking in specifics about the chemical processes involved. These arguments, however, go more to the weight of this evidence than to the question presently before me, which is whether Alcon has demonstrated the existence of genuine issues of material fact. While this evidence may be largely, or even entirely, circumstantial, I find that it raises issues of fact.

As for B & L's argument that proposals for new products, as a matter of law, cannot constitute trade secrets, I note initially that in the case that B & L cites in support of that proposition, *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173 (2d Cir.1993), the Second Circuit expressly declined to reach that conclusion, because it found alternative grounds upon which to base its holding that the alleged trade secret in that case—the concept of a small-size, upscale hotel room designed to capture the low-budget market segment of the hotel industry—was not a trade secret at all, because it was a non-novel idea that was not used secretly and continuously in commerce. *Id.* at 1177.

More to the point, however, the ideas discussed in Dr. Minno's notes and memorandum appear to go beyond the general *concept* of a simultaneous cleaning/disinfecting system. Dr. Minno went into some detail in discussing the chemical aspects of such a system. Thus, even if the basic idea of marketing such a product could not constitute a trade secret, that does not mean that the fruits of Alcon's research aimed at developing the product could not be protectible as trade secrets.

B & L also contends that information about the use of OPTI–SOFT and OPTI–ZYME in combination with each other could not have constituted a trade secret because in fact they did not work together effectively as a cleaning/disinfecting system. There is some evidence that Alcon recognized that the combination of these products reduced the antimicrobial activity of OPTI–SOFT, but it is nevertheless clear that Alcon was conducting research in this area and working on ways to correct these problems. The extent of Dr. Minno's knowledge of that research remains in dispute.

Also at issue is whether and to what extent Dr. Minno disclosed any trade secrets to B & L after he began working there. Although B & L maintains that Alcon has presented no evidence that he did, and that Alcon's claims in this regard are based upon pure speculation, I believe that here too, there is enough evidence to warrant submitting these claims to a jury.

First, it should be kept in mind that what Dr. Minno did and said after he began working for B & L is outside Alcon's independent knowledge. While discovery has yielded some evidence relating to these matters, the fact remains that at the time of the events in question, Alcon was not in a position to determine what was occurring inside B & L. Moreover, given the risk of exposure to liability, it is highly unlikely that an employee who does divulge his past employer's trade secrets would be incautious enough to say so on paper or even orally. Obviously none of

this allows Alcon to make completely baseless allegations, but it is against that backdrop that one must view the evidence that Alcon has presented.

On October 17, 1994, B & L's in-house counsel, Denis A. Polyn, Esq., sent a letter to Alcon's counsel, James A. Arno, Esq., which mostly addressed then-ongoing negotiations concerning a licensing agreement relating to the '607 patent. Toward the end of the letter, Polyn, responding to an earlier request made by Arno, summarized the development of the invention covered by the '607 patent. He stated that after B & L scientists Mary Mowrey-McKee and David Proud determined that the osmolality of the solution was affecting the antimicrobial activity of DYMED, B & L's biguanide disinfecting agent, Dr. Minno "suggested that this relationship should also be present in antimicrobial agents other than DYMED. Additional testwork was then conducted on other known antimicrobial agents confirming George's belief." Kline Aff. 196 Ex. 17.

Although Polyn optimistically closed by saying that he was "look[ing] forward to working with [Arno] to bring this matter to a successful conclusion," sadly that was not to be the case, and at least according to Alcon, that very letter was part of the reason. Alcon states that ultimately, only one class of antimicrobial agents other than the biguanide disinfectants that B & L used in its products was set forth in the claims of the '607 patent: polymeric quaternary ammonium compounds, of which Alcon's Polyquad is one. Alcon claims that Dr. Minno knew from his exposure to confidential Alcon information that increasing the ionic strength of Polyquad solutions adversely affected Polyquad's antimicrobial activity.

Alcon also points to a memorandum dated March 7, 1988, in which Dr. Minno advised one Ms. K. Monnat at B & L that "[t]here is a potential that Optisoft and Optizyme may work together as a one-step cleaning/disinfection system. This would add another competitive system (clean-ing—disinfection) on the market besides Ultrazyme." Kline Aff. 196 Ex. 16. He then asked her to schedule biocidal efficacy testing of Opti–Soft and Opti–Zyme in combination, using Opti–Soft alone as a control. Alcon alleges that Dr. Minno was aware from his work at Alcon of the potential for a combined system using Opti–Soft and Opti–Zyme. Alcon states that B & L did then test that combination, and ultimately included claims relating to Polyquad-containing enzyme/disinfectant combinations in its application for the '607 patent—a patent on which Dr. Minno was named as an inventor.

Alcon also notes the existence of a May 31, 1989 memorandum by Dr. Minno entitled "Polyquad Technically Speaking Draft." Kline Aff. 196 Ex. 23. Dr. Minno explained that the memo "discusses the differences between Alcon's OptiFree which contains Polyquad and B & L's ReNu containing Dymed." Although Alcon does not appear to contend that this memo contains any of its trade secrets, it is some evidence that Dr. Minno may have been looked upon at B & L as something of an authority on Dymed.

I conclude, therefore, that B & L has failed to carry its burden to show that there are no genuine issues of material fact regarding the first two counterclaims. Alcon's evidence relating to these counterclaims may be thin in some respects, but on a motion for summary judgment, the court is charged with the duty of "issue finding," not "issue resolution." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994).

**B. Alcon's Fourth Counterclaim**

In its fourth counterclaim, Alcon seeks the imposition of a constructive trust over the '607 patent and any other patents or patent applications that correspond in whole or in part to the '607 patent, and to an accounting for all benefits realized by B & L as a result of its alleged use of Alcon's proprietary information. Alcon alleges

that: while he was employed at Alcon, Dr. Minno had a fiduciary relationship with Alcon; pursuant to his employment agreement, Dr. Minno agreed not to use or disclose to others Alcon's proprietary information, either during or after his employment at Alcon; after he left Alcon to work for B & L, Dr. Minno, in violation of his Alcon employment agreement, disclosed Alcon's proprietary information to B & L, and wrongfully assigned B & L an ownership interest in that information; and B & L wrongfully obtained the '607 patent by using that information.

Alcon first asserted this counterclaim in an amended answer filed on February 4, 1999, pursuant to a February 1, 1999 order of Magistrate Judge Jonathan W. Feldman granting Alcon's previously-filed motion to amend its answer.

■ B & L contends that the only reason Alcon wanted to add this counterclaim to its answer was that it knew that its first and second counterclaims were time-barred. Unlike the claims for misappropriation of trade secrets and unfair competition, constructive trust claims are governed by a six-year statute of limitations. C.P.L.R. § 213(1). *See Krauss v. Iliescu,* 686 N.Y.S.2d 78, 79 (2d Dep't 1999). The limitations period begins to run upon the occurrence of the wrongful act giving rise to a duty of restitution. *Id.; Matter of Sakow,* 219 A.D.2d 479, 631 N.Y.S.2d 637 (1st Dep't 1995); *Sitkowski v. Petzing,* 175 A.D.2d 801, 802, 572 N.Y.S.2d 930 (2d Dep't 1991). B & L contends that Alcon has not stated a valid constructive trust claim, but has merely dressed its first two counterclaims in constructive trust language in a transparent attempt to avoid the statute of limitations. B & L argues that because this counterclaim is at its heart a claim for injury to property, it too should be governed by § 214(4)'s three-year statute of limitations, and dismissed, both as untimely and on the merits.

Alcon admits that at least part of the reason that it wanted to add this counterclaim was its concerns over the possible timeliness problems with the first and second counterclaims. Transcript of Proceedings Before Hon. David G. Larimer, July 7, 1999, at 88. Alcon contends, however, that it has stated a valid constructive trust claim under New York law, and that this is not simply another version of its other counterclaims.

I do not believe that Alcon's reasons for asserting this counterclaim are of any significance in deciding whether this claim can withstand B & L's motion for summary judgment on timeliness grounds. If in fact Alcon has set forth all the elements of a constructive trust claim, then the claim was timely brought. In addition, the fact that this claim is based upon the same facts as Alcon's claims for misappropriation of trade secrets and unfair competition does not mean that it is simply a tort claim in disguise; constructive trust claims can arise out of the same facts as tort claims. *See, e.g., Ivy v. Kilgore,* No. 97 CIV. 128, 1998 WL 633689 *8 (S.D.N.Y. Sept. 15, 1998) (denying defendants' motion for summary judgment on plaintiffs' constructive trust claim, because it rested upon plaintiffs' claims for breach of fiduciary duty and misappropriation of trade secrets, which involved disputed issues of material fact).

"Generally, New York law requires that a person establish four elements before a court will impose a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment." *United States v. Coluccio,* 51 F.3d 337, 340 (2nd Cir.1995); *In re Koreag, Controle et Revision, S.A.,* 961 F.2d 341, 352 (2d Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *Bankers Sec. Life Ins. Soc'y v. Shakerdge,* 49 N.Y.2d 939, 940, 428 N.Y.S.2d 623, 406 N.E.2d 440 (1980); *Simonds v. Simonds,* 45 N.Y.2d 233, 241–42, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978); *Neos v. Neos,* 692 N.Y.S.2d 133, 134, 1999 WL 399045 *1 (2d Dep't

June 14, 1999). Although these elements are meant to "provide important guideposts, the constructive trust doctrine is equitable in nature and should not be 'rigidly limited.'" *Koreag*, 961 F.2d at 352 (quoting *Simonds*, 45 N.Y.2d at 241, 408 N.Y.S.2d 359, 380 N.E.2d 189); *accord Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 743 F.Supp. 176, 180 (S.D.N.Y.1990) (the elements are not talismanic and courts have imposed a constructive trust in the absence of some of these elements).

Viewing the evidence in the light most favorable to Alcon, the nonmoving party, I find that it has set forth enough facts at least to give rise to genuine issues of material fact with respect to this claim. B & L's motion for summary judgment is therefore denied.

Keeping in mind that no one element is absolutely essential to a constructive trust claim, I nevertheless believe that plaintiff has presented some evidence to support each element. As for the first element, *i.e.* a confidential or fiduciary relationship, the law is clear that the mere existence of an employer-employee relationship, standing alone, does not give rise to a confidential or fiduciary relationship. *See, e.g., Van Brunt v. Rauschenberg*, 799 F.Supp. 1467, 1474 (S.D.N.Y.1992) ("As case law makes clear, a close relationship between an employer and an employee is not enough" to give rise to a confidential relationship); *Farrell v. Comstock Group, Inc.*, 211 A.D.2d 493, 621 N.Y.S.2d 325 (1st Dep't 1995) (refusing to impose constructive trust where "the plaintiff showed only an ordinary employer-employee relationship").

There appears to be little New York case law addressing the precise situation in this case, that is, an employee whose employment agreement contains a confidentiality agreement prohibiting the employee from ever divulging the employer's trade secrets to a third party. The parties have cited cases involving employer/employee relationships, and cases involving promises of confidentiality, but none of them involve both at the same time.

For example, in *Rodgard Corp. v. Miner Enterprises, Inc.*, 914 F.Supp. 907, 925 (W.D.N.Y.1995), *aff'd in part, vacated on other grounds in part*, 108 F.3d 1394 (Fed. Cir.1997), cited by B & L, the court held that "the plaintiffs ha[d] failed to prove that the requisite confidential relationship existed prior to their disclosure to the defendants of confidential information," which was "made during the course and as a result of arm's-length business negotiations and transactions ...." The parties in *Rodgard*, however, did not have an employment relationship, but had simply contracted to do certain business with each other.

Likewise, in *Ellis v. Provident Life & Accident Ins. Co.*, 3 F.Supp.2d 399, 412 (S.D.N.Y.1998), *aff'd*, 172 F.3d 37 (2d Cir. 1999), also cited by B & L, the court stated that "courts have repeatedly rejected claims of constructive trust in the employment context due to the absence of a fiduciary relationship between an employer and an employee." *Ellis*, however, involved a retired employee suing his former employer for insurance sales commissions, and no confidentiality agreement was involved.

The only case cited by Alcon in support of its contention that the facts show the existence of a confidential relationship between Alcon and Dr. Minno, *Ivy v. Kilgore*, 1998 WL 633689, did not involve an employer/employee relationship. Rather, it appears that the relationship between the parties in that case was more akin to that of business partners or participants in a joint venture.

There are cases dealing with other types of claims that indicate that in some circumstances, an employer and employee can share a confidential or fiduciary relationship. *See, e.g., Nutronics Imaging, Inc. v. Danan*, No. CV 96–2950, 1998 WL 426570 *2 (E.D.N.Y. June 10, 1998) ("An employee ... has a fiduciary duty not to use or divulge confidential knowledge acquired

during his employment"; claim for breach of fiduciary duty); *Deleu v. Scaife*, 775 F.Supp. 712, 716 (S.D.N.Y.1991) (denying defendant employer's motion for summary judgment on former employee's claim for breach of fiduciary duty on ground that there were issues of material fact concerning whether parties enjoyed fiduciary relationship); *Pathmark Graphics Inc. v. J.M. Fields, Inc.*, 53 A.D.2d 531, 532, 384 N.Y.S.2d 177 (1st Dep't 1976) (discussing employer's claim for compensation paid to former employee during period in which he was abusing fiduciary relationship with employer). In addition, the court has found some authority from outside New York indicating that a confidentiality agreement may constitute evidence of a confidential relationship between the parties to the agreement. *See Den–Tal–Ez, Inc. v. Siemens Capital Corp.*, 389 Pa.Super. 219, 240–41, 566 A.2d 1214 (1989).

While *Den–Tal–Ez* is not binding in this action, it nevertheless makes what would seem to be an obvious, yet pertinent point: that where the relationship between two parties is governed by an express agreement of confidentiality, that is surely some evidence that the relationship itself could be considered "confidential" in nature. In my view, therefore, the facts that Dr. Minno was an employee of Alcon *and* that he had signed a confidentiality agreement are sufficient at least to give rise to an issue of fact in this regard. *See A. Brod, Inc. v. SK & I Co., L.L.C.*, 998 F.Supp. 314, 327 (S.D.N.Y.1998) ("The existence of a confidential relationship is a question of fact"). The fact that the existence of a confidential relationship is not a *sine qua non* for establishing a constructive trust claim also suggests that it would be inappropriate to assign too much weight to the alleged lack of such a relationship here. *Republic of Philippines v. Marcos*, 806 F.2d 344, 355 (2d Cir.1986) ("constructive trust is simply a remedy to prevent unjust enrichment and may or may not involve a fiduciary relationship"), *cert. denied*, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987); *A. Brod*, 998 F.Supp. at 328 ("a constructive trust may be imposed even in the absence of a confidential or fiduciary relationship"; citing cases).

Turning to the second element, *i.e.* a promise, B & L does not appear to dispute that Dr. Minno's agreement not to divulge any confidential Alcon information is sufficient to establish that a relevant promise existed. B & L contends, however, that Alcon has not presented any evidence showing that Alcon transferred any property to Dr. Minno in reliance on that promise. Alcon asserts that this element has been met by the evidence that Alcon gave Dr. Minno access to Alcon's confidential research, development and commercial information in reliance on Dr. Minno's promise that he would not disclose that information to others.

B & L argues that Alcon cannot establish this element because by Alcon's own admission, it never transferred title or a property interest to Dr. Minno, whose employment contract with Alcon expressly stated that all confidential information made known to Dr. Minno during his employment would be treated as the sole property of Alcon, and that any patentable or valuable ideas conceived by Dr. Minno during his employment were to be assigned to Alcon.

In support of its position, B & L relies on *Caballero v. Anselmo*, 759 F.Supp. 144, 147 (S.D.N.Y.1991), in which the court stated that "[i]n order to establish a constructive trust it is necessary to show that defendant wrongfully obtained title rather than mere possession." *Caballero*, however, is factually inapposite. In that case, the defendant had been given the authority to vote the plaintiff's shares of stock, as well as possession of the stock certificates, but at no time was he given title to the shares, which remained in plaintiff's name. He then sold the stock to a third party without the plaintiff's permission. Based on those facts, the court concluded that "nothing more than mere possession was transferred, and that is not sufficient to

give rise to our imposition of a constructive trust." *Id.* at 148.

■ In contrast, the case at bar involves an intangible: confidential information. The case law indicates that imposition of a constructive trust is viewed as an appropriate remedy when a party has wrongly used confidential information belonging to another. For example, in *Snepp v. United States*, 444 U.S. 507, 515, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam), in which Government sued a former CIA agent who had breached his secrecy agreement by publishing a book about certain CIA activities in South Vietnam, the Supreme Court stated that a constructive trust was "the natural and customary" remedy for the breach of trust.

Similarly, in *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988 (2d Cir.1983), the Second Circuit stated that "a constructive trust on the 'fruits' of ABKCO's [wrongful] acquisition [of defendant/counterclaimant's music rights] was a proper remedy." In support of that holding, the court cited Restatement of Restitution § 200 for the proposition that where a fiduciary in violation of his duty to the beneficiary acquires property through the use of confidential information, he holds the property so acquired in constructive trust through the beneficiary. *Id. See also United States v. Reed*, 601 F.Supp. 685, 700 (S.D.N.Y.) ("A person who receives confidential information from another and misappropriates it for personal benefit is deemed to hold the proceeds of the misappropriation in a constructive trust for the benefit of the entrusting party"), *rev'd on other grounds*, 773 F.2d 477 (2d Cir.1985); *Diamond v. Oreamuno*, 24 N.Y.2d 494, 501, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969) (profits made by agent in stock transactions undertaken because of his "inside" information "are held in constructive trust for the principal") (quoting Restatement of Agency 2d § 388, Comment (c)). Cases from other jurisdictions are in accord with this view. *See, e.g., Sperry Rand Corp. v. A–T–O, Inc.*, 447 F.2d 1387, 1392 (4th Cir.1971) (one method for assessing damages for misappropriation of trade secrets is "the profits earned by the wrongdoer by the use of the misappropriated material (an equitable remedy which treats the wrongdoer as trustee ex maleficio for the victim of the wrongdoer's gains from his wrongdoing)"; applying Virginia law), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1972); *Tlapek v. Chevron Oil Co.*, 407 F.2d 1129, 1133–34 (8th Cir.1969) (upholding finding that constructive trust existed over leases for property obtained by former employee of oil company over land that employee had theorized could be successfully drilled for oil, since employee developed that theory from the use of confidential information to which he had been granted access while in oil company's employ as a geologist, "a position of trust and confidence"; applying Arkansas law).

As for the fourth factor, unjust enrichment, questions of fact exist for the same reasons stated with respect to Alcon's first and second counterclaims. B & L's contention that this element has not been met depends on its assertion that Dr. Minno did not divulge to B & L any of Alcon's confidential or proprietary information. That must be determined at trial. Since unjust enrichment "lies at the heart of the equitable remedy of a constructive trust," *Brand v. Brand*, 811 F.2d 74, 80 (2d Cir. 1987), and has been described by the Second Circuit as "the key factor" in whether to impose a constructive trust under New York law, *Koreag*, 961 F.2d at 354, these factual issues strongly counsel against granting B & L's motion for summary judgment on this counterclaim.[7]

---

7. I also note that the fact that B & L is not itself a party to the alleged confidential relationship or promise of confidentiality between Dr. Minno and Alcon does not prevent the imposition of a constructive trust. "[S]ubsequent transfers of the trust property do not necessarily preclude a constructive trust." *A. Brod*, 998 F.Supp. at 327. "[T]he beneficiaries of a constructive trust have the option of tracing the trust property ... into the hands

255

## CONCLUSION

Plaintiff Bausch & Lomb Incorporated's motions for summary judgment dismissing defendant's first and second counterclaims (Docket Item 193) and for summary judgment dismissing defendant's fourth counterclaim (Docket Item 197) are denied.

Defendant Alcon Laboratories, Inc.'s motion for summary judgment of indefiniteness (Docket Item 184) is denied.

IT IS SO ORDERED.

of third parties not involved in the relationships that initially gave rise to the constructive trust if unjust enrichment would otherwise result and the third party is not a bona fide purchaser." *Hazlett v. Fusco,* 177 A.D.2d 813, 576 N.Y.S.2d 427, 429 (3rd Dep't 1991).