**SYSTEM MANAGEMENT ARTS INCORPORATED, Plaintiff,**

v.

**AVESTA TECHNOLOGIES, INC. and David Zager, Defendants.**

**No. 97 CIV 8101 RWS.**

United States District Court, S.D. New York.

April 4, 2001.

Proskauer Rose by Nancy Kilson, Kenneth Rubenstein, New York City, for Plaintiff.

Skadden, Arps, Slate, Meagher & Flom by Edward V. Filardi, Daniel A. DeVito, New York City, for Defendants.

---

## OPINION

SWEET, District Judge.

Defendants and counterclaim-plaintiffs Avesta Technologies, Inc. ("Avesta") and David Zager ("Zager") (collectively, "Avesta") have moved for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, against plaintiff and counterclaim-defendant System Management Arts Incorporated, and counterclaim-defendants Shaula Yemini and Yechiam Yemini (collectively, "Smarts"), declaring as invalid certain of the claims of the patent-in-suit in this patent infringement action. For the reasons set forth below, the motion is denied.

---

**1.** Avesta's partial summary judgment motion is addressed to "claims 1–30" of the '668 Patent. Smarts has not alleged infringement as to all of these claims. The propriety of entering summary judgment as to the validity

## The Parties

The parties are set forth in the previous opinion of this Court, familiarity with which is presumed. *See System Management Arts Inc. v. Avesta Technologies, Inc.*, 87 F.Supp.2d 258 (S.D.N.Y.2000).

## Prior Proceedings

This action was commenced on October 31, 1997, by the filing of a complaint by Smarts alleging *inter alia* infringement by Avesta of certain claims of U.S. Patent No. 5,528,516 (the "'516 Patent") and U.S. Patent No. 5,661,668 (the "'668 Patent"). Avesta filed an answer and counterclaims on December 7, 1997, denying infringement and asserting counterclaims against Smarts and Shaula Yemini and Yechiam Yemini, seeking *inter alia* a declaratory judgment that the patents-in-suit are invalid for failure to satisfy the definiteness requirement of 35 U.S.C. § 112 ¶ 2.[1]

Smarts later withdrew its claim for infringement of the '516 Patent, leaving the '668 Patent as the only patent-in-suit.

The instant motion was filed on October 16, 2000, and oral argument was heard on December 13, 2000, at which time the matter was marked fully submitted.

## Facts

The facts set forth below are gleaned from the parties' Rule 56.1 statements, declarations, exhibits, and other submissions, with any factual inferences drawn in the non-movant's favor. They do not constitute findings of fact by the Court.

The '668 Patent traces its origin to patent application U.S. Serial No. 08/249,282 (the "parent application") filed on May 25, 1994, in the United States Patent and Trademark Office (the "PTO"). The '668

of claims other than those as to which Smarts alleges infringement has not been addressed by the parties. In any event, as the motion will be denied, this issue will not be reached.

Patent issued from a patent application, U.S. Serial No. 08/679,443, which claimed the benefit of priority of patent application U.S. Serial No. 08/465,754, which in turn claimed the benefit of the filing date of the parent application.

The '668 Patent describes "a method and apparatus for efficiently determining ... the source of problems in a complex system based on observable events." ('668 Patent at 1:17–19.) The patent "has broad application to any type of complex system, including computer networks, satellites, communication systems, weapons systems, complex vehicles such as spacecraft, medical diagnosis, and financial market analysis." (*Id.* at 1:19–23.)

The '668 Patent notes that "[a]s computer networks and other systems have become more complex, their reliability has become dependent upon the successful detection and management of problems in the system." ('668 Patent at 1:25–29.) In addition, the increased complexity of systems means that "the rate at which observable events occur has increased" greatly, "making problem management more difficult." (*Id.* at 1:34–37.) For example, when the number of computers in a computer network increases, the complexity of the network and the rate at which problems occur in the network increase at an even greater rate. (*Id.* at 11:38–44.)

The '668 Patent describes "a four-step process." ('668 Patent at 8:15–16.) One step is "[c]reating a causality data representation of problems and symptoms for the system to be monitored...." (*Id.* at 8:37–40.) The causality data representation, or causality mapping, "includes data to describe problems, events and their causal relations both within a component and across components." (*Id.* at 8:40–43.)

The causality mapping "may associate with causal relations probabilities, or other measures of likelihood, that certain events cause each other. It may also associate other performance measures that may be useful in correlating events, such as the expected time for the causal relations among events to happen." ('668 Patent at 8:43–48.) The causality mapping can be used for "specifying, detecting, and identifying exceptional events (such as problems) in a system having observable events." (*Id.* at 29:30–34.)

Smarts has asserted that Avesta is infringing claims 1, 9, 13, 14, 15, 17, 18, 29, and 31 of the '668 Patent.[2] Claims 1, 15, and 29 of the '668 Patent are independent claims. Claims 9, 13, and 14 are dependent upon claim 1, that is, they incorporate all limitations of claim 1, and claims 17 and 18 are dependent on claim 15.[3]

Independent claim 1 covers in pertinent part:

1. A computer-implemented method for use in analyzing events in a system having a plurality of components arranged in a particular configuration,

**2.** Over the course of this litigation, Smarts has identified various different claims of the '668 Patent as to which it alleges infringement by Avesta. In the Amended Response to Defendants' Second Set of Interrogatories (the "Amended Interrogatory Response") Smarts identifies these claims as 1, 9, 13–20, 24, 27, 29, 30 and 31. In the expert report of Nancy A. Lynch ("Lynch") Smarts identifies these claims as 1, 9, 11–13, 15, 17, 18, 29 and 31. In its submissions relating to the instant motion, Smarts identifies these claims as 1, 9,

13, 14, 15, 17, 18, 29 and 31, without explaining why claims 11, 12, 19, 24, and 30— previously identified in either the Amended Interrogatory Response or Lynch's report— are not included. This most recent list is deemed to be the all-inclusive list of '668 Patent claims as to which Smarts alleges infringement by Avesta.

**3.** Claim 31, an independent claim, is not at issue in this motion.

each component belonging to one of a plurality of component classes, the method comprising the steps of:

. . . . .

(4) converting the first and second representations into a causality mapping based on the configuration specification, wherein the *causality mapping comprises a mapping between events in the system and likely causes thereof.*

('668 Patent at 29:57–61, 30:6–10) (emphasis added).

Independent claim 15 covers in pertinent part:

Apparatus for use in analyzing events in a system having a plurality of components arranged in a particular configuration, each component belonging to one of a plurality of component classes, the apparatus comprising:

means for converting....

[certain information] into a *causality mapping comprising a mapping between events in the system and likely causes thereof.*

('668 Patent at 31:34–38, 50–51) (emphasis added).

Independent claim 29 covers in pertinent part:

A machine programmed with a computer program which receives (i) a set of events ... (ii) a set of propagations of events ... and (iii) a configuration specification ... wherein the computer program converts the set of events and the set of propagations of events into a causality mapping on the basis of the particular system configuration, wherein the *causality mapping comprises a mapping between events in the system and likely causes thereof.*

('668 Patent at 32:40–42, 48–52) (emphasis added).

Although the word "likely" and the word "cause" appear in the '668 Patent specification, the phrase "likely causes" does not. "Likely" is used in the specification as an adjective modifying the word "problem[s]," as in: "a report is generated indicating the most likely problem or problems based on the observable events" ('668 Patent at 9:18–19); and "a mapping of system symptoms to likely problems, preferably with probabilities corresponding to each mapping" (*Id.* at 11:41–43). The specification does not expressly define the word "likely."

The term "cause" is used in the specification in the context of describing "events" or "problems" which "cause" other "events," as in: "event 1 causes event 8, which in turn causes event 9" ('668 Patent at 13:42–45); "the causality closure is the union of all observable events the event may cause and the probability it may cause each of them" (*Id.* at 26:35–38); and "CAUSALITY statement: specifies a problem which may cause a set of observable events...." (*Id.* at 27:48–65).

"Problems can include faults, performance degradation, intrusion attempts, and other exceptional operational conditions requiring handling." ('668 Patent at 1:28–30.) A "symptom" is "an event that may be observed." (*Id.* at 13:29–33.) An "exceptional event may be an event that requires some handling ... while a symptom may be an observable event ... caused by the exceptional event." (*Id.* at 8:24–30.)

The patent includes a number of figures. Figure 2A, a copy of which is attached as an appendix to this opinion, "shows a causality graph of events which may occur in a system." ('668 Patent at 10:6–7.) This causality graph "comprises a set of numbered nodes, each representing an event in the system, and directed edges (arrows) connecting these nodes, each representing

a causality relationship between the events at the tail and head of the edge [i.e., the arrow]." (*Id.* at 12:48–54.) According to the '668 Patent specification, "in FIG. 2A, event 1 causes event 3, which causes event 4, which in turn causes event 5, and so on." (*Id.* at 12:54–56.) The specification goes on, "[o]f course, event 3 might have other causes, such as event 5, as indicated in FIG. 2A." (*Id.* at 12:64–65.)

An example provided in the patent of the relationships represented in Figure 2A is: event 1 in Figure 2A may be a disk drive failure in a computer. ('668 Patent at 12:57–58, Fig. 2A.) Event 3 "caused by event 1, may be an error message generated by the computer to which the failed disk drive is attached ... indicating an error message generated by the computer to which the failed disk drive is attached ... indicating the detected disk drive failure." (*Id.* at 12:59–62.) In other words, the disk drive failure brings about or produces the error message. "In this context, event 1 can be classified as a problem (i.e., it can be fixed), while event 3 can be classified as a symptom caused by the problem." (*Id.* at 12:62–64.)

Figure 2B, a copy of which is attached as an appendix to this opinion, represents the same information contained in Figure 2A, but "in the form of an incidence matrix." ('668 Patent at 13:3.)[4] The matrix is comprised of rows and columns, which intersect to form cells. Each row and each column represents an event. Each cell contains a value—Figure 2B uses either "0" or "1"—"indicating whether or not a particular event is caused by another event." (*Id.* at 13:7–8.) The specification notes as an example that event 3 in the third column causes events 3, 4 and 7 in the third, fourth, and seventh rows, be-

cause the cells at the intersection of this column with these rows contain a "1." "[A]lthough zeros and ones are shown in FIG. 2B, the cell values can be any value which would indicate the probability that the given event causes a corresponding event." (*Id.* at 13:11–13.)

Another example in the patent of a probabilistic measure, such as the one represented by Figure 2B, is the statement that "the likelihood that a reported power failure in one of the computer nodes is the result of a blown fuse might be assigned a probability of 0.25." ('668 Patent at 11:41–46.)

The specification explains that "[w]here it is difficult to obtain accurate estimates of the probabilities, discrete probability values such as high (h), medium (m) or low ($l$) may be used to indicate relative probability levels." ('668 Patent at 17:39–43.)

Elsewhere the specification notes that causality "statements may be tailored for the particular system being monitored," so that "probabilities and other parameters will be selected according to the particular type of system." ('668 Patent at 28:35–37.)

The phrase "likely causes" did not appear in the '668 Patent claims until the amendment in February 6, 1997 of then-pending claim 77, which was later renumbered and issued as claim 1 of the '668 Patent, and then-pending claim 86, which was later renumbered and issued as claim 15.

In the "Remarks" accompanying the amendment (the "Amendment Remarks"), submitted to the PTO, Smarts stated:

> Minor clarifying amendments have been made to independent claims 77 and 86. In addition to amendments to overcome

---

4. Actually, there is at least one discrepancy between the two figures, as Figure 2A represents event 5 as causing events 3 and 5, but Figure 2B represents event 5 as causing events 3 and 11.

the rejections under 35 U.S.C. § 112, second paragraph, these claims have been amended to indicate that the recited causality mapping maps events in the system to likely causes of the events. In many situations, such causes may correspond to problems within the system. In other situations, however, the events may not necessarily be problems. (Amendment Remarks at 9–10.)

Then-pending claim 77, later renumbered and issued as claim 1, was amended as follows:

77. (Twice Amended). A computer-implemented method ~~of generating a causality mapping~~ for use in analyzing events....

   (4) converting the first and second representations into a ~~the~~ causality mapping based on the configuration specification, wherein the causality mapping comprises a **mapping** between ~~of~~ events in the system and ~~to~~ likely **causes thereof** ~~problems in the system~~ ...

(Amendment Remarks at 2–3.) [5]

Then-pending claim 86, later renumbered and issued as claim 15, was amended as follows:

86. (Twice Amended), Apparatus ~~for generating a causality mapping~~ for use in analyzing events in a system....

   into a ~~the~~ causality mapping comprising ~~, wherein the causality mapping comprises~~ a mapping **between** ~~of~~ events in the system and ~~to~~ likely **causes thereof** ~~problems in the system~~....

(Amendment Remarks at 3.)

"Cause" as a noun is defined in Merriam–Webster's Collegiate Dictionary as: "a reason for an action or condition"; "something that brings about an effect or a result"; and "a person or thing that is the occasion of an action or state." *Merriam–Webster's Collegiate Dictionary* 674 (10th ed.1993). "Cause" is defined in the Oxford English Dictionary as: "[t]hat which produces an effect"; "that which gives rise to any action, phenomenon, or condition"; and "[a] person or other agent who brings about something, with or without intention." II *The Oxford English Dictionary* 1000 (2d ed.1989). "Cause" is defined in the American Heritage Dictionary as: "something that produces an effect, result, or consequence"; and "[t]he person, event, or condition responsible for an action or result." *The American Heritage Dictionary* 249 (2d College ed.1982).

"Likely" as an adjective is defined in Merriam Webster's Collegiate Dictionary as: "having a high probability of occurring or being true: very probable"; "apparently qualified: suitable"; "reliable, credible"; "promising"; and "attractive." *Merriam–Webster's Collegiate Dictionary* 674 (10th ed.1993). "Likely" is defined in the Oxford English Dictionary as: "having a resemblance, like, similar"; "having an appearance of truth or fact; that looks as if it would happen, be realized, or prove to be what is alleged or suggested; probable"; and "seemly, becoming, appropriate." VIII *The Oxford English Dictionary* 949 (2d ed.1989). "Likely" is defined in the American Heritage Dictionary as: "possessing or displaying the qualities or characteristics that make something probable"; "within the realm of credibility; plausible"; "apparently appropriate; suitable"; "apt to achieve success or yield a desired outcome; promising"; and "attractive; pleasant." *The American Heritage Dictionary* 731 (2d College ed.1982).

---

**5.** Stricken-out text was deleted by the amendments; bold text was added.

During the deposition of Lynch, a Smarts expert, the following exchange occurred between counsel for Avesta and Lynch regarding her understanding of the term "rootCause," which is used in Avesta's allegedly-infringing "Trinity" product:

Q. In the context of the sentence [appearing in a description of Trinity], what is your understanding of the term and the phrase rootCause?

A. It's an initial cause of a symptom, something that occurred first, and later triggered other events, other failure events, the symptoms that are described in this sentence. A rootCause would be one that does not itself have a further cause; one that was the initial cause of the observed problems.

. . . . .

A. As I recall, the distinction [in the '668 Patent] is between problems and symptoms. So, they may be using the word problem [in the '668 Patent] in the same way that rootCause is used in Trinity.

Q. So, is it your testimony that the term rootCause when used in connection with Trinity is equivalent to the term cause when used in the 668 patent?

. . . . .

A. . . . I can't remember whether the word cause was used everywhere in the 668 patent to denote rootCause. They could have been talking about immediate cause or using the word cause in other ways. . . .

Q. . . . Is it your testimony that the term rootCause as used in Trinity is equivalent to the term cause as used in claim 1 of the 668 patent?

. . . . .

A. Yes, I believe so. Cause in Point 4 of Claim 1 is referring to the actual cause, the initial cause, or the root-Cause.

(Lynch Tr. at 981–84.)

In a declaration submitted in connection with the instant motion to "amplify and explain" her deposition testimony, Lynch states that what she meant by the testimony set forth above is that Trinity's 'root cause' falls within the meaning of 'cause' in claim 1, and not that 'cause' in the ['668 Patent] claim includes only 'root causes.' (Lynch Decl. ¶ 10.)

Lynch was asked at her deposition about the meaning of the phrase "likely causes" as it appears in claim 1 of the '668 Patent. (Lynch Tr. at 781). Her initial response was:

So I don't have an objective way of saying—of measuring whether something is likely or not. The best I can do here is that there's some assessment made by the designers to choose among the causes something that they consider the more likely causes, the highest priority causes, perhaps.

(*Id.* at 780–81.) Lynch was then asked whether she had "arrive[d] at an interpretation of what the phrase 'likely causes' means when it's used in claim 1 of the '668 patent." (*Id.* at 781) Lynch responded:

The patent describes many different ways of assessing likelihood. They introduce probabilities in some of their discussions where they try to associate a probability with certain events being caused . . .

. . . There's another strategy described in the patent that takes into account times—the times at which different events happened and . . . how long it's likely to take for a certain cause to trigger a certain effect.

(Id. at 781–83.) Lynch went on to discuss other ways of assessing likelihood described in the patent. (*Id.*)

At one point counsel for Avesta queried, "It's [the phrase likely causes'] certainly less than all the possible causes of an event; is that fair to say?" (Lynch Tr. at 784.) Lynch responded that "[i]t sounds like it's closer to what the patent is saying if there's some selection made. But I don't think I would rule out returning the set of possible causes." (*Id.*)

Lynch was asked whether "likely causes" "mean[s] the most likely causes, something less than all the possible causes of the event, or the set of entire possible causes of the event, or something else?" (Lynch Tr. at 785.) Lynch responded:

> So what isn't clear is what exactly is meant by "likely." How do you evaluate or measure what cause is more likely than another one. Does it imply some kind of probability measure or statistical analysis. They haven't actually described that kind of thing carefully.
>
> I will interpret it that you make some kind of judgment that there were the most likely causes, that you don't return all the possible events. But you don't really have to have the one that is some absolute measure of the most likely causes. Something in between. They do make that clear by giving such a range of possibilities to suggest how you might make this determination.

(*Id.* at 786–87.) In her declaration, Lynch states that "[b]ecause the '668 patent describes many methods for assessing likelihood, she could not (and cannot) point to one of those methods as being the sole meaning of 'likely.'" (Lynch Decl. ¶ 9.)

Lynch was also asked about how a person skilled in the art would interpret the term "likely" in claim 1:

Q. Does that mean that the term [likely] is vague to you or would be vague to one of ordinary skill in the art?

A. Probably.

Q. Probably?

A. Uh-huh. It's likely.

Q. Cheerio. When you first read this, did you find the word "likely causes" to be vague.

A. Probably so.

(Lynch Tr. at 790–91.) In her declaration Lynch states that when she "said that the term 'likely causes' was probably vague," she "meant to imply that the term 'likely causes' as used in the '668 patent claims has a broad interpretation with many alternative possibilities." (Lynch Decl. ¶ 5.)

Lynch states in her declaration that, in her "opinion, the '668 patent claims, read in light of the patent specification, reasonably apprize a person skilled in the art of the scope of the invention." (Lynch Decl. ¶ 12.) She further states that "[t]he definition of 'likely causes' is those which bring about or produce events according to a 'measure of likelihood.' The patent uses the word 'measure' to include both numerical and non-numerical assessments." (*Id.* ¶ 13.)

Ashok K. Agrawala ("Agrawala"), an expert for Avesta, testified at his deposition that a person skilled in the art would find the term "likely" "an ambiguous term because ... no explanation of that [term] is given, and ... there is no guidance as to how that should be interpreted, whether it is most probably, whether it is most likely, whether it is defined somewhere else, in terms of what it should be." (Agrawala Tr. at 615.) When asked if "a person skilled in the art would have a problem understanding the claims," Agrawala replied, "I said there is a certain amount of vagueness in the term .... [b]ecause there are a range of possibilities." (*Id.* at 617–18.)

Agrawala was also asked directly whether he thought a person skilled in the art "cannot understand the claim because the word 'likely' is not properly defined in the patent," (Agrawala Tr. at 662), to which he replied:

That's not what I was saying. All I was saying is that there are multiple meanings to the word and, therefore, the one skilled in the art would have to choose one and go with that, that the term is not that clearly specified or defined.

(*Id.* at 662–63.)

Dennis Allison ("Allison"), also an expert for Avesta, testified at his deposition that in his opinion the phrase "likely causes" in claim 1 has "the same basic ambiguity" that he found in the phrase "likely problems," which is employed in claim 14, due to "the ambiguity of the word 'likely.'" (Allison Tr. at 780–81.) Indeed, Allison expressly stated that in his opinion both of these claims were invalid, on the basis of indefiniteness, due to the ambiguity in the term "likely." (*Id.*)

Allison also discussed his opinion that "causes" was a term with "potential ambiguity" based on his recollection—which was incorrect—that the word "causes" does not appear in the specification. (Allison Tr. at 788.) When Allison initially testified regarding various of the '668 Patent claim terms he found to be imprecise or vague he did not include "likely causes" among them. (*Id.* at 114–19.) Allison conceded that he did not recognize the possibility of an ambiguity in the term "likely causes" until Avesta's counsel "pointed [it] out" to him. (*Id.* at 791–98.)

### Discussion

#### I. *The Applicable Legal Standards*

#### A. *The Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### B. *The Law Governing The Indefiniteness Inquiry*

■ Avesta seeks a determination that all but one of the '668 Patent claims are invalid for failure to satisfy the "clear and definite" requirement of 35 U.S.C. § 112 ¶ 2 because the term "likely causes," appearing in the relevant independent claims, is indefinite. Section 112 states in relevant part:

The [patent application] specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112 ¶ 2. This provision, commonly referred to as the definiteness requirement, imposes on patent applicants a duty to "clearly circumscribe what is what is foreclosed from future enterprise." *United Carbon Co. v. Binney & Smith Co.,* 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232 (1942) (explaining purpose of definiteness requirement of former § 31 of Title 35, United States Code); *see Solomon v. Kimberly–Clark Corp.,* 216 F.3d 1372, 1379 (Fed.Cir.2000) (explaining purpose of definiteness requirement of § 112 ¶ 2) (*citing United Carbon,* 317 U.S. at 233, 63 S.Ct. 165). The primary purpose of the definiteness requirement is to alert adequately the public to what the patentee has claimed, thereby putting potential infringers on notice as to what might constitute infringement. *See Solomon,* 216 F.3d at 1379.

"A decision as to whether a claim is invalid under this provision requires a determination whether those skilled in the art would understand what is claimed."

*Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1217 (Fed.Cir.1991). Patentees are required to be "as precise as the subject matter permits." The degree of precision required "is a function of the nature of the subject matter." *Miles Labs., Inc. v. Shandon Inc.,* 997 F.2d 870, 875 (Fed. Cir.1993). The Federal Circuit Court of Appeals has explained:

The amount of detail required to be included in claims depends on the particular invention and the prior art, and is not to be viewed in the abstract but in conjunction with whether the specification is in compliance with the first paragraph of section 112. If the claims, read in the light of the specifications, reasonably apprize those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more.

*Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 624 (Fed.Cir.1985) (internal quotation marks and citation omitted).

■ An issued patent has a "strong presumption of validity," and an accused infringer who attacks the validity of the patent-in-suit "bears the burden of showing patent invalidity by clear and convincing evidence." *Al–Site Corp. v. VSI, Int'l, Inc.,* 174 F.3d 1308, 1323 (Fed.Cir.1999); *see* 35 U.S.C. § 282 ("A patent shall be presumed valid. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."). Clear and convincing evidence is "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly probable." *Price v. Symsek,* 988 F.2d 1187, 1191 (Fed.Cir.1993) (internal quotation marks and citation omitted).

"A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Communications, LLC v. Int'l Trade Comm'n,* 161 F.3d 696, 705 (Fed. Cir.1998); *see Solomon,* 216 F.3d at 1377 (same); *see also Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir.1995) (en banc) (courts have "power and obligation to construe as a matter of law the meaning and language used in patent claims"), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

■■ In construing patent claims, a court is to look first to the intrinsic evidence of record, namely, the claims, specification, and prosecution history. *Markman,* 52 F.3d at 979. Within the intrinsic evidence there is a "hierarchy of analytical tools." *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1344 (Fed.Cir.1998). "The actual words of the claim are the controlling focus." *Id.* However, the specification, which contains a written description of the invention, is also important, "in particular to determine if the patentee acted as his own lexicographer ... and ascribed a certain meaning to those claim terms." *Id.; see Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir.1996) ("Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.").

"Thus, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics,* 90 F.3d at 1582. This makes the specification "highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

If in evidence, the court may also consider the prosecution history of the patent, *see Markman,* 52 F.3d at 980, which contains the complete record of the proceedings before the PTO, including any express representations made by the applicant regarding the scope of the claims. The prosecution history "is often of critical significance in determining the meaning of the claims." *Vitronics,* 90 F.3d at 1582.

■■ Where the meaning of the claims cannot be determined based on the intrinsic evidence, but only in such circumstances, the court may also look to evidence that is "external to the patent and file history" as an aid in its analysis of the claim. *Vitronics,* 90 F.3d at 1584. Such extrinsic evidence includes expert testimony and dictionaries. *See id.; Markman,* 52 F.3d at 980–81.[6]

## II. *The Motion For Partial Summary Judgment Is Denied*

### A. *The Intrinsic Evidence*

Independent claims 1, 15, and 29 each involve a "causality mapping between events in the system and likely causes thereof."[7] The other claims at issue are

6. Although technically extrinsic evidence, dictionaries "hold a special place and may sometimes be considered along with the intrinsic evidence," *Interactive Gift Express, Inc. v. Compuserve Inc.,* 231 F.3d 859, 866 n. (Fed. Cir.2000), "so long as the dictionary defini-

tion does not contradict any definition found in or ascertained by a reading of the patent documents," *Vitronics,* 90 F.3d at 1584 n. 6 (*quoted in Interactive,* 231 F.3d at 866 n.).

7. Claim 1 recites a method comprising a series of steps culminating in a step of convert-

dependent claims, which incorporate by reference every limitation of the claims upon which they depend and are invalid for indefiniteness if those independent claims are. *See In re Jolly*, 172 F.2d 566, 567 (C.C.P.A.1949). It is undisputed that the phrase "likely causes" is critical to the construction of claims at issue here, so that if that phrase is indefinite within the meaning of § 112 ¶ 2 then so would be the claims.

Avesta contends that the meaning of "likely causes" cannot be derived from the intrinsic evidence, and is subject to multiple, mutually exclusive interpretations, rendering the claims at issue indefinite to a person of ordinary skill in the art. Avesta further contends that the extrinsic evidence, namely, the testimony of both its own and Smarts' experts, confirms that "likely causes" is indefinite. Smarts responds that the patent reveals that "likely causes" means "those which bring about or produce events according to a likelihood measure." Pl. Br. at 11. Smarts further maintains that, even if the meaning of this term is not clear based on the intrinsic evidence, summary judgment for Avesta is precluded because the testimony of Smarts' expert, Lynch, creates a genuine dispute of material fact as to indefiniteness.

### 1. *"Causes" Is Used In Its Ordinary Sense*

Avesta avers that the meaning of the word "causes" is not defined in the '668 Patent, and proposes several mutually exclusive definitions which it maintains find support in the record evidence, namely: (1) "problems that require human intervention"; (2) "any observable event giving

rise to another observable event"; and (3) "an event that is not triggered by any preceding event." Def. Br. at 8. Smarts responds that "causes" is used in the ordinary sense of the word, namely, as things which bring about or produce a result.

As explained earlier, words in a claim are "generally given their ordinary and customary meaning" unless the specification or prosecution history make clear that some other meaning is intended. *Vitronics*, 90 F.3d at 1582. The ordinary meaning of "cause" as a noun is a thing which brings about or produces something else. *See Merriam–Webster's Collegiate Dictionary* 674 (10th ed.1993); II *The Oxford English Dictionary* 1000 (2d ed.1989); *The American Heritage Dictionary* 249 (2d College ed.1982).

Although the '668 Patent does not expressly set forth a definition of the noun "causes," the specification refers to "events" or "problems" which "cause," in the sense of bringing about or producing, other "events." (*See, e.g.*, '668 Patent at 13:42–45 (event 1 causes event 8); *id.* at 27:48–65 ("a problem which may cause a set of observable events").) Thus, the specification's use of "cause" as a verb is entirely consistent with the proposition that the claims use the noun "cause" in its ordinary sense.

Moreover, none of the alternative definitions proposed by Avesta is consistent with the evidence. First, the language "problems that require human intervention" does not appear in the '668 Patent, and the only passage supporting this definition is used in the specification to define an "exceptional event." ('668 Patent at 12:18–40.) The specification reveals that an "exceptional event" is merely one kind of

---

ing certain information into a "causality mapping," which is then stored. Claim 15 recites an apparatus with means for converting certain information into a causality mapping.

Claim 29 recites a special purpose computer programmed with a computer program that creates a causality mapping from certain input.

cause (*see id.*), and the Amendment Remarks also explain that "causes" are not limited to "problems" (Amendment Remarks at 9–10 ("In many situations ... causes may correspond to problems within the system. In other situations ... the events may not necessarily be problems.")).[8]

Second, Avesta's definition of "cause" as "any observable event that gives rise to another observable event" is not supported by the specification language upon which Avesta relies, namely, the passage explaining Figure 2A. ('668 Patent at 12:54–64.) The explanation of Figure 2A reveals that it is not limited to "observable events" but, rather, represents causal relations among a broader category, "events." (*Id.*).

Third, "an event that is not triggered by any preceding event" is not supported by the patent language and the extrinsic evidence upon which Avesta relies—Lynch's deposition testimony—is susceptible to other interpretations. Lynch was asked to describe her understanding of the term "rootCause," which is used in Avesta's Trinity product, and whether she considered that term to be equivalent to the term "cause" in claim 1 of the '668 Patent. Avesta urges that Lynch testified that the term "cause" in claim 1 has the same meaning as the term "rootCause." Taken in context, however, Lynch's testimony is consistent with the view urged by Smarts, and by Lynch herself in her declaration, that Lynch understood that she was being asked whether the "rootCause" events as used in Avesta's Trinity product infringes or falls within claim.[9] Avesta's proposed interpretation, while not entirely unreason-

ably, does not satisfy its burden to show indefiniteness by clear and convincing evidence.

### 2. *The Meaning Of "Likely" Or "Likely Causes" Cannot Be Determined Based On The Intrinsic Evidence*

Avesta also contends that the meaning of the word "likely" and, therefore, the phrase "likely causes" cannot be determined from the patent and is subject to several mutually-exclusive definitions, namely: (1) probable (50% chance or greater of being correct); (2) more probable than something else (even if less than 50% chance of being correct); (3) most probable (having a higher degree of being correct than anything else); or (4) possible (any chance of being correct); or (5) something else. In other words, Avesta urges that a person of ordinary skill in the art must be able to determine how likely a "likely cause" is.

Smarts counters that "likely" is defined in the patent as "according to a likelihood measure" and, therefore, that "likely causes" means "those which bring about or produce events according to a likelihood measure." Furthermore, Smarts maintains, because the Smarts product is applicable to many types of systems with varying amounts of available information regarding the events to be monitored, it is impossible to define "likely" in the manner proposed by Avesta. Thus, according to Smarts, the definition it offers of "likely causes" is as specific as the subject matter permits. Finally, Smarts avers, the pat-

---

**8.** Avesta contends that the patent prosecution history supports their view that "likely causes" is indefinite because this history reveals that "causes" are not limited to "problems." However, while Avesta is correct that under the '668 Patent claims "causes" are broader in scope than "problems," this does

not render the claims indefinite but, rather, is consistent with the notion that "causes" is used in its ordinary sense.

**9.** *See* n. 13, *infra,* for a discussion of why Lynch's declaration may be considered.

ent adequately describes the contested term because it discloses several "likelihood measures" according to which it is possible to determine the "likely causes" of events, namely: (1) "deterministic measures" (i.e., to measure whether an event is caused by another event or not); (2) "probabilistic measures" (e.g., to measure whether there is a 0.25, or 25%, probability that event A causes event B); (3) "discretely probabilistic measures" (e.g., to measure whether there is a low, medium, or high probability that event A causes event B);[10] and (4) "other performance measures, such as for determining the expected time for causal relations among events to happen."

Although the patent does not expressly define "likely" as "according to a likelihood measure," the specification does use the term "measures of likelihood," including to refer to "probabilities," and explains that such measures may be "associate[d] with causal relations." The patent also discloses several ways of measuring likelihood which may be employed using the Smarts product. Figure 2A is a representation of whether certain events cause other events—what Smarts refers to as a "deterministic measure"—for example, event 5 causes event 3 because there is an arrow running from event 5 to event 3.[11] Using the same logic, it can be seen that event 6 does not cause any of the other events represented in Figure 2A because there are no arrows running from it to any of those other events. Figure 2B represents a "probabilistic" method using numbers. It is apparent that if the number in the cell

that is at the intersection of one event and another is "0," then there is zero probability of a causal relationship between those events, whereas if the number is one then there is a 100% probability of such a relationship. In addition, as the number could be between 0 and 1, a probability of less than 100% (e.g., .25 would be a 25% probability) that one event causes another could also be represented. The specification also refers to situations in which the probability of a causal relationship would be measured as "low," "medium," or "high," that is, according to what Smarts calls a "discretely probabilistic" method.

What the patent does not do is define "likely causes" according to a threshold of likelihood. For example, the patent does not confine "likely causes" to those events which have at least an X% probability of being the cause of other events. Nor does the specification describe the events represented in Figures 2A and 2B as being limited to those events that have a certain threshold likelihood of being the causes of other events. Rather, these figures appear to represent all causal relationships between the events depicted.

"Likely" is a word of degree, and "[d]efiniteness problems often arise when words of degree are used in a claim." *Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed.Cir. 1984). Where a word of degree is used, the court's task is to "determine whether the patent's specification provides some standard for measuring that degree . . . .

10. The terms "deterministic measures," "probabilistic measures," and "discretely probabilistic measures" are employed by Smarts in its briefing, and do not appear in the '668 Patent.

11. Avesta objects that Smarts' reference to "deterministic measures" as a measure of likelihood is an attempt to introduce through lawyer argument information not found anywhere in the intrinsic or extrinsic evidence. Certainly, the term "deterministic measure" is not found in the patent. However, the explanation of Figure 2A comports with Smarts' characterization of Figure 2A as a representation of whether one event causes another.

[and] whether one of ordinary skill in the art would understand what is claimed...." *Id.*

"That some claim language may not be precise ... does not automatically render a claim invalid." *Seattle Box,* 731 F.2d at 826. "Mathematical precision should not be imposed for its own sake; a patentee has the right to claim the invention in terms that would be understood by persons of skill in the field of the invention." *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1557 (Fed. Cir.1996), *abrogated on other grounds, Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 234 F.3d 558 (Fed. Cir.2000) (en banc).

Smarts maintains that the '668 Patent provides "standards" for measuring the term "likely" (and, therefore, the phrase "likely causes") by setting forth various ways of measuring likelihood, such as those represented in Figures 2A and 2B. However, the patent's explanation of likelihood measures does not provide "standards" as that term is used in the case law and, indeed, Smarts' theory results in circular reasoning under that law.

In *Seattle Box,* the Federal Circuit Court of Appeals confronted an indefiniteness challenge to a patent claim that used the term "substantially equal to." 731 F.2d at 826. The patent concerned an invention for packaging oil pipes of various diameters and weights for transport and claimed, specifically, a "spacer block" "of a height substantially equal to or greater than the thickness of the tier of pipe length." *Id.* at 820–21. The alleged infringer challenged the patent as indefinite on the theory that a person of ordinary skill in the art could not determine "just how equal 'substantially equal to' is." *Id.* at 826. The court rejected this challenge, concluding that an expert would know the claim's limitations because "[t]he specifica-

tion clearly sets forth, for example, that the divider blocks are intended to absorb the weight of overhead loads." *Id.* In addition, "even if [the alleged infringer] needed to experiment so as to determine the limits of the ... claims, the claims would not be invalid under section 112." *Id.* Thus, the information provided in the patent regarding the purpose of the invention, along with additional information that could be obtained through experimentation, was sufficient to provide a "standard" for determining the scope of "substantially equal to," a term of degree. *See id.*

Similarly, in *Orthokinetics,* the Federal Circuit of Appeals considered an indefiniteness challenge to a patent claim that used the term "so dimensioned." *See* 806 F.2d at 1575. The invention in *Orthokinetics* was a travel chair for disabled persons, and the patent claimed a travel chair "wherein said front leg portion [of the chair] is so dimensioned as to be insertable through the space between the doorframe of an automobile and one of the seats thereof." *Id.* The alleged infringer maintained that the term "so dimensioned" was indefinite because a user of ordinary skill could not determine the meaning of that term "until he construct[ed] a model and test[ed] the model on vehicles ranging from a Honda Civic to a Lincoln Continental to a Checker cab." *Id.* The court held that the term was not indefinite because the specification made clear that "one desiring to build and use a travel chair must measure the space between the selected automobile's doorframe and its seat and then dimension the front legs of the travel chair so they will fit in that particular space in that particular automobile," and through performance of this "task ... one of ordinary skill in the art would easily have been able to determine the appropriate dimensions." *Id.* at 1576. It was appropriate for the claim to cover use of the

invention with various automobiles, and the phrase "so dimensioned" was "as accurate as the subject matter permits, automobiles being of various sizes." *Id.*

■ The analysis in *Seattle Box* and *Orthokinetics* confirms that a standard for measuring a term of degree need not be defined with numerical specificity, and reveals that the requisite "standard" may be derived from information in the patent regarding the purpose of the invention—or of the specific aspect of the invention to which the term of degree applies—as well as from experimentation. *See Seattle Box,* 731 F.2d at 820–21, 826; *Orthokinetics,* 806 F.2d at 1575; *see also Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys.,* 96 F.Supp.2d 1006, 1020 (N.D.Cal.2000) (description of one part of product, a balloon dilation catheter, as "substantially larger" than another was not indefinite in part because specification revealed that difference had to be "such as to result in a substantial increase in flexibility"); *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.,* 77 F.Supp.2d 514, 550–51 (D.Del. 1999) ("substantially completely wetted" was not indefinite in part because degree of wetness required of filaments used in invention could be ascertained with reference to explanation in patent that filaments had to be sufficiently wetted such that they [were] capable of "becomingly randomly distributed in the melt homogenization process").

In this case, however, consideration of the purpose of the invention does not yield the same type of assistance in understanding the standard by which the term of degree at issue, "likely," is to be measured. The '668 Patent asserts claims relating to the generation of a mapping between events and their likely causes. The purpose of the invention, as explained by the claims, specification, and prosecution history, is to aid in determining the source of

problems in complex systems based on observable events or, put another way, to map events in a system to likely causes of those events. This information does not provide a standard for measuring the term of degree "likely" because it merely tells the reader—or, more precisely, the person of ordinary skill in the art—that "likely causes" are those causes which the invention is designed to identify, i.e., the causes that are likely. This is merely circular reasoning.

Nor would experimentation help in determining how likely a cause must be in order for it to be a "likely cause." The patent explains that the degree of precision with which the likelihood of causes can be measured will depend on the information available for the particular system. For example, in one system it might be possible to create a very precise mapping, with the likelihood that one event causes another expressed as a probability percentage, while in another system it might be possible only to state that the likelihood that one event causes another is "low," "medium," or "high." Presumably, a person of ordinary skill in the art would be able to ascertain through experimentation the degree of precision possible for a given system. However, knowing that likelihood can be measured only as low, medium, or high for a particular system does not enable a person of ordinary skill in the art to determine how likely a given cause must be in order for it be a "likely cause" within the meaning of the '668 Patent. For example, is an event that has a "medium" probability of causing another event a "likely cause"? This is a question which experimentation does not answer.

Moreover, Smarts injects additional ambiguity into the term "likely causes" when it contends that "likelihood measures" includes "other performance measures, such as for determining the expected time for

causal relations among events to happen." The specification not only fails to make clear that "other performance measures" are a category of "likelihood measure" but, indeed, the logical inference to be drawn from the passage relied upon by Smarts is to the contrary. In this passage, the specification describes how a causal mapping may have associated with it "causal relations probabilities, or other measures of likelihood," and goes on to state that "other performance measures that may be useful in correlating events, such as the expected time for the causal relations among events to happen," may also be associated with the causal mapping. By using the term "other performance measures," the specification distinguishes, as a matter of syntax, such measures from the items described in the preceding sentence, namely, "measures of likelihood." That is, "measures of likelihood" appear to be one type of "performance measure," while correlation by expected time appears to be a different type of "performance measure." In addition, it is hard to see how the expected time for a causal relation to happen is an indication of whether one event is a cause of another. Rather, the expected time for a causal relation to happen speaks, by its terms, to when one causal event is likely to cause another.

Smarts points out correctly that there is no doctrinal rule that requires it to define "likely" with mathematical precision. *See Modine Mfg.,* 75 F.3d at 1557. Moreover, the intrinsic evidence reveals that the Smarts product is intended to apply to a broad range of systems, and that in any given system the degree of precision with which likelihood can be assessed and mapped will vary.

Whether or not the definition of "likely causes" as "those which bring about or produce events according to a likelihood measure" is as accurate a definition as the

subject matter permits is thus a critical question for the indefiniteness inquiry in this case. The intrinsic evidence in this case does not answer that question. Put another way, the intrinsic evidence does not reveal whether Avesta is correct in insisting that "likely" must be defined in terms of some sort of threshold of likelihood in order for a person of ordinary skill in the art to have reasonable notice of the scope of the invention. On the one hand, given the ambiguities in the intrinsic evidence, it cannot be said as a matter of law that the claims at issue are definite within the meaning of § 112 ¶ 2. On the other hand, given the burden of proof on Avesta, this same evidence does not warrant the conclusion as a matter of law that the claims are indefinite.

Therefore, as the indefiniteness issue cannot be resolved based on the intrinsic evidence, it is appropriate to consider extrinsic evidence. *See Vitronics,* 90 F.3d at 1584. Both parties have offered expert testimony in this regard.

### B. *The Extrinsic Evidence*

Smarts maintains that the evidence from its expert, Lynch, creates a genuine issue of material fact regarding how a person of ordinary skill in the art would interpret the phrase "likely causes" and, therefore, as to the issue of whether the claims are definite within the meaning of § 112 ¶ 2. 35 U.S.C. § 112 ¶ 2. For its part, Avesta avers that all the expert testimony, including that of Lynch, supports the view that the claims are indefinite and, thus, that there is no genuine dispute of fact. Avesta also contends, apparently in the alternative, that under the rules governing the indefiniteness inquiry there are no factual issues involved and, therefore, no genuine dispute of material fact. This latter contention will be addressed first because it goes to the nature of the court's inquiry,

and since the parties' experts disagree in certain respects.

### 1. *The Nature Of The Indefiniteness Inquiry*

Avesta relies primarily on *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed.Cir.1998) (en banc) for its contention that indefiniteness is a pure question of law involving no underlying factual issues. Although Avesta never quite says so, the implication of its position is that a disagreement among the parties' experts, by definition, cannot create a genuine issue of material fact as to indefiniteness because none of the material considered in such an inquiry, including expert testimony, is factual in nature.

In *Cybor*, the issue before the Federal Circuit Court of Appeals was the scope of appellate review over claim construction by a district court. 138 F.3d at 1454. The court held that such review was *de novo* "because claim construction is purely a matter of law," *id.*, and that the scope of this *de novo* appellate review "includ[es] any allegedly fact-based questions relating to claim construction," *id.* at 1456. The court expressly rejected the "view that ... while construction is a legal question for the judge, there may also be underlying fact questions." *Id.* at 1455.

Since a determination of claim indefiniteness is "drawn from the court's performance of its duty as the construer of patent claims," *Personalized Media*, 161 F.3d at 705, Avesta maintains that a district court's indefiniteness inquiry is governed by the holding in *Cybor*, 138 F.3d at 1454–55. Avesta also points out the Federal Circuit Court of Appeals has stated, again in the context of claim construction, that when a district court considers expert testimony it is "not crediting certain evidence over other evidence or making factual evidentiary findings. Rather, the court is

looking to the extrinsic evidence to assist in its construction of the written document." *Markman*, 52 F.3d at 981.

Yet, since *Cybor*, numerous district courts have treated the issue of indefiniteness under § 112 ¶ 2 as an inquiry that is a question of law with underlying issues of fact. *See, e.g., A.K. Stamping Co. v. Instrument Specialties, Co.*, 106 F.Supp.2d 627, 644 (D.N.J.2000) (summary judgment precluded because "substantial evidence ... could lead a trier of fact to conclude" that claims of patent-in-suit not indefinite); *TC Mfg. Co. v. Polyguard Prods., Inc.*, No. 96 C 8392, 1999 WL 753932, at *4 (N.D.Ill. Sept. 15, 1999) (summary judgment precluded because expert evidence created genuine issue of fact as to whether one skilled in art could understand claims); *E.I. Dupont De Nemours & Co. v. Millennium Chem., Inc.*, No. C.A. 97–237–SLR, 1999 WL 615164, at *3 (D.Del. Aug. 2, 1999) ("[D]efendant must demonstrate that there is no genuine issue of material fact with respect to the indefiniteness of the ... patent claims."); *LNP Eng'g*, 77 F.Supp.2d at 549–50 (whether person skilled in art would understand meaning of patent claim "is a fact-based inquiry"); *Bausch & Lomb v. Alcon Laboratories, Inc.*, 64 F.Supp.2d 233, 245 (W.D.N.Y. 1999) ("[U]nderlying factual issues ... preclude the entry of summary judgment."); *but see Exxon Research & Eng'g Co. v. United States*, 54 U.S.P.Q.2d 1519, 1520 (Fed.Cl.2000) ("[T]here are no underlying questions of fact to be resolved" in adjudicating patent claim indefiniteness).

Interestingly, many of these district courts do not even cite *Cybor*, indicating that they did not believe it to be on point. *See A.K. Stamping*, 106 F.Supp.2d 627 (setting forth rules governing indefiniteness inquiry without citing *Cybor*); *TC Mfg.*, 1999 WL 753932, (same); *E.I. Dupont*, 1999 WL 615164 (same); *LNP*

*Eng'g,* 77 F.Supp.2d 514 (same); *Bausch & Lomb,* 64 F.Supp.2d 233 (same); *but see Exxon,* 54 U.S.P.Q.2d at 1521, 1523 (relying in part on *Cybor* to hold that disagreement among experts over whether patent terms definite did not give rise to genuine dispute of fact because indefiniteness is issue of law and "the [expert] opinions do not concern a 'fact' "). This may be because, while the Federal Circuit has often stated that the indefiniteness inquiry is "drawn from" the district court's role as a construer of patent claims, *see, e.g., Personalized Media,* 161 F.3d at 705, the circuit court has not expressly held that these inquiries are one and the same, nor that the indefiniteness inquiry can not involve underlying questions of fact. Moreover, to state that the indefiniteness inquiry is a question of law or "legal conclusion," *id.,* does not answer the question. The Federal Circuit has recognized that some questions of law involve underlying issues of fact. *See Union Pacific Res. Co. v. Chesapeake Energy Corp.,* 236 F.3d 684, 57 U.S.P.Q.2d 1293, 1296 (Fed.Cir.2001) (patent enablement is "question of law" but "[a]s is often true of legal questions ... the ultimate legal conclusion of enablement rests on factual underpinnings....").

■ The reasoning of those courts holding that the indefiniteness inquiry may involve underlying issues of fact is persuasive. Indeed, to hold otherwise would seem to mask the actual role being played by the district court.[12]

Of course, if the issue of indefiniteness can be resolved based on the intrinsic evidence alone, then the question of possible disputes of underlying fact based on conflicting expert evidence will not arise, since extrinsic evidence is not properly considered in that situation. *See Vitronics,* 90 F.3d at 1584. Moreover, the fact that extrinsic evidence may be considered does not necessarily mean there is a genuine dispute of fact. This question must be evaluated under the ordinary standards applicable to a summary judgment motion, and bearing in mind the burden of proof on the party alleging invalidity.

### 2. *The Expert Testimony*

According to Avesta, all three of the experts who testified regarding the meaning of "likely causes," including Lynch, agreed that this term is vague and ambiguous, such that a person of ordinary skill in the art would not be reasonably apprised of the scope of the claimed invention. However, Avesta overstates the testimony upon which it relies.

Lynch was unable to describe "likely causes" in terms of a threshold of likelihood. For example, at one point in her testimony she stated that she interpreted "likely causes" as "sound[ing] like ... there's some selection made," but conceded that she would not "rule out returning the set of possible causes."

---

**12.** In *Cybor,* a dissenting member of the panel made a similar point with respect to the majority's position that claim construction never involves underlying issues of fact, quoting a district court opinion that:

> When two experts testify differently as to the meaning of a technical term, and the court embraces the view of one ... the court has engaged in weighing evidence and making credibility determinations.... But when the Federal Circuit Court of Appeals states that the trial court does not do .

something that the trial court does and must do to perform the judicial function, the court knowingly enters a land of sophistry and fiction.

138 F.3d at 1475 (Radar, J., dissenting in part) (citation omitted). It is noted that the potential for confusion inherent in Avesta's position is evidenced by its own briefing on this motion, as it has submitted a "Statement of Undisputed Facts," pursuant to Local Rule 56.1.

Lynch explained that her understanding of the term "likely causes" is that it involves "many different ways of assessing likelihood." Lynch identified some of those ways, such as the assignment of probabilities—which is one of the measures of likelihood described in the specification and is represented in Figure 2B. In her declaration, Lynch reaffirmed that she "could not (and cannot) point to one of [these] methods as being the sole meaning of 'likely.'"

Lynch did testify that the term "likely" was "probably vague" to a person of ordinary skill in the art. However, it is not clear that she was expressing an opinion that such a person would not be reasonably apprized of the scope of the invention. Lynch states in declaration that what she "meant to imply" was that the term "likely causes" has a "broad interpretation with many alternative possibilities."[13] Not only is this a reasonable inference from her testimony, but it is instructive to note that one of Avesta's experts, Agrawala, gave similar testimony. Agrawala testified that the term "likely" is "ambiguous" and had "a certain amount of vagueness .... [b]ecause there are a range of possibilities." Moreover, when asked directly whether a person skilled in the art could not understand the claim because of the use of the term "likely," Agrawala answered, "That's not what I was saying. All I was saying is there are multiple meanings as to the word and, therefore, the one skilled in the art would have to choose one...."

Thus, Avesta's position that the '668 Patent claims necessarily fail for indefiniteness unless "likely causes" can be defined according to a "sole meaning" is undercut somewhat not only by Lynch's testimony, but also by that of Agrawala.

As for Allison, he testified that the term "likely" has "a basic ambiguity" and expressly opined that the claims are invalid based on the indefiniteness of this term. However, he also found ambiguity in the term "likely causes" based at least in part on his recollection, which was mistaken, that the term "causes" is not found in the patent specification.

Furthermore, none of the expert testimony cited by the parties addresses the issue of whether the degree of precision provided by the '668 Patent claims is the most precision that can be expected based on the nature of the subject matter. Nor did they address how this consideration plays into the understanding of the invention's scope which a person of ordinary skill in the art would be able to derive from the patent.

Certainly, Lynch's testimony is not entirely unproblematic for Smarts' position. Moreover, the conclusory statement in her declaration that the claims are definite and valid provides little aid in the inquiry.[14] Nonetheless, alleged inconsistencies within the testimony of a patentee's expert is a relatively weak form of evidence in claim-

---

**13.** Of course, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own sworn statement ... without explaining the contradiction or attempting to resolve the disparity." *Sinskey v. Pharmacia Ophthalmics, Inc.,* 982 F.2d 494, 498 (Fed.Cir.1992). Certainly, it is appropriate to consider any tensions or inconsistencies between Lynch's deposition testimony and her declaration in considering her expert opinion. However, given the ambiguities in Lynch's testimony, it cannot be said that her declaration flatly contradicts that testimony. Therefore, it is appropriate to consider her declaration, along with her deposition testimony, in determining whether there is a genuine issue of fact. There is also to be considered the fact that her deposition has not yet been completed.

**14.** The same can be said of Allison's conclusory statement to the contrary.

ing indefiniteness. *See Bausch & Lomb,* 64 F.Supp.2d at 239–40 (denying summary judgment where party claiming indefiniteness "relie[d] heavily on alleged inconsistencies within [patentee's] own definitions" of disputed term, including "within the various declarations and statements of [patentee's expert]"). In addition, while Avesta's position finds support in the testimony of all three experts, some of Avesta's own experts' testimony is not without its ambiguities.

Bearing in mind the heavy evidentiary burden on a party claiming patent invalidity, however, the extrinsic evidence is sufficient to give rise to a genuine issue of material fact as to indefiniteness. Therefore, summary judgment on this issue is precluded.

### Conclusion

Therefore, for the reasons set forth above, the motion for partial summary judgment is denied.